## JAY *v.* BOYD, DISTRICT DIRECTOR, IMMIGRATION & NATURALIZATION SERVICE.

No. 503. Argued May 3, 1956.—Decided June 11, 1956.

*Will Maslow* and *John Caughlan* argued the cause for petitioner. On the brief were *Mr. Caughlan* and *Norman Leonard.*

*John V. Lindsay* argued the cause for respondent. With him on the brief were *Solicitor General Soboloff, Assistant Attorney General Olney, Gray Thoron, Beatrice Rosenberg, J. F. Bishop* and *L. Paul Winings.*

*Mr. Maslow* and *Shad Polier* filed a brief for the American Jewish Congress, as *amicus curiae,* urging reversal.

MR. JUSTICE REED delivered the opinion of the Court.

[Petitioner brought this habeas corpus proceeding to test the validity of the denial of his application under §§ 244 (a)(5) and 244 (c) of the Immigration and Nationality Act of 1952, 66 Stat. 215, 216, 8 U. S. C. §§ 1254 (a)(5) and 1254 (c), for discretionary suspension of deportation. He contends that the denial of his application was unlawful because based on confidential, undisclosed information. The District Court denied the writ, holding, so far as pertinent here, that, "after complying with all the essentials of due process of law in the deportation hearing and in the hearing to determine eligibility for suspension of deportation, [the Attorney General may] consider confidential information outside the record in formulating his discretionary decision." [1] The Court of Appeals affirmed, concluding, *inter alia,* that petitioner was not "denied due process of law in the consideration of his application for suspension of deportation because of the use of this confidential information." 222 F. 2d 820, 820–821; rehearing denied, 224 F. 2d 957. We granted certiorari, 350 U. S. 931, to consider the validity of 8 CFR, Rev. 1952, § 244.3, the Attorney General's regulation which provides:

> "§ 244.3 *Use of confidential information.* In the case of an alien qualified for . . . suspension of deportation under section . . . 244 of the Immigra-

---

[1] The District Judge wrote no opinion. The quote is taken from the Findings of Fact and Conclusions of Law, Record 15, 17–18.

tion and Nationality Act the determination as to whether the application for . . . suspension of deportation shall be granted or denied (whether such determination is made initially or on appeal) may be predicated upon confidential information without the disclosure thereof to the applicant, if in the opinion of the officer or the Board making the determination the disclosure of such information would be prejudicial to the public interest, safety, or security."

Following a hearing, the fairness of which is unchallenged, petitioner was ordered deported in 1952 pursuant to 8 U. S. C. (1946 ed., Supp. V) § 137–3. That section provided for the deportation of any alien "who was at the time of entering the United States, or has been at any time thereafter," a member of the Communist Party of the United States.[2] Petitioner, a citizen of Great Britain, last entered the United States in 1921. At the deportation hearing he admitted having been a voluntary member of the Communist Party from 1935 through 1940. He attacked the validity of the deportation order in the courts below on the ground that there is "no lawful power . . . under the Constitution or laws of the United States" to deport one who has "at no time violated any condition imposed at the time of his entry." But that point has been abandoned, and in this Court petitioner in effect concedes that he is deportable. See *Galvan* v. *Press*, 347 U. S. 522; *Harisiades* v. *Shaughnessy*, 342 U. S. 580.

In 1953, upon motion of petitioner, the deportation order was withdrawn for the purpose of allowing petitioner to seek discretionary relief from the Attorney General under § 244 (a)(5) of the Act. The application for

---

[2] A similar provision is now contained in 8 U. S. C. § 1251 (a)(6)(C).

suspension of deportation was filed and a hearing thereon was held before a special inquiry officer of the Immigration and Naturalization Service.[3] The special inquiry officer found petitioner to be qualified for suspension of deportation [4]—that is, found that petitioner met the statutory prerequisites to the favorable exercise of the discretionary relief.[5] But the special inquiry officer decided the case for suspension did not "warrant favorable

[3] "In determining cases submitted for hearing, special inquiry officers shall exercise . . . the authority contained in section 244 of the Immigration and Nationality Act to suspend deportation." 8 CFR, Rev. 1952, § 242.6.

[4] The finding was:

"As the respondent has not been found to have been a Communist Party member later than 1940, it follows that more than ten years has elapsed since the assumption of the status which constitutes the ground for his deportation. Evidence of record, consisting of affidavits of persons well acquainted with the respondent, together with employment records, as well as a report of an investigation by this Service, satisfactorily establishes that he has been physically present in the United States for a continuous period of not less than ten years last past. A check of the local and Federal records reveals no criminal record. An independent character investigation, as well as the above related affidavits tend to establish that for the ten years immediately preceding his application for relief, he has been a person of good moral character.

". . . He has stated that if he were deported he would suffer extreme and unusual hardship in that he would be separated from relatives and friends, and in effect that he would find it almost impossible to maintain himself because of lack of funds. On the record, respondent appears to be qualified for suspension of deportation."

[5] Section 244 (a) (5) of the Act provides in pertinent part that "the Attorney General may, in his discretion, suspend deportation" in the case of a deportable alien who (1) has been present in the United States for at least ten years since the ground for his deportation arose; (2) "proves that during all of such period he was and is a person of good moral character"; and (3) is one "whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship."

action" in view of certain "confidential information." [6] The Board of Immigration Appeals dismissed an appeal, basing its decision "Upon a full consideration of the evidence of record and in light of the confidential information available." [7] Thus, the Board in considering the appeal reviewed the undisclosed information as well as the evidence on the open record. Petitioner then commenced the present habeas corpus action.

---

[6] In his petition for a writ of habeas corpus petitioner alleged, "Upon information and belief," that the "confidential information" considered by the special inquiry officer, and later by the Board of Immigration Appeals, was nothing more than the fact that petitioner's name had appeared on a list circulated by the American Committee for the Protection of the Foreign Born, an organization which had been designated subversive by the Attorney General, ex parte. Petitioner claimed that "Solely by reason of [his] name appearing on said list, his case for discretionary relief was prejudged and no fair or impartial consideration of his case was given . . . ." In its Return to the Order to Show Cause, the Government denied that the confidential information relied upon was as alleged by petitioner, and denied that the case had been prejudged. The District Court made no specific finding with respect to the character or substance of the confidential information, but it did determine that the special inquiry officer and the Board of Immigration Appeals "exercised their independent judgment in denying discretionary relief." See *Accardi* v. *Shaughnessy,* 347 U. S. 260, 349 U. S. 280; *Marcello* v. *Bonds,* 349 U. S. 302.

Petitioner apparently abandoned this allegation and argument in the Court of Appeals. In his petition for a writ of certiorari in this Court, he indirectly raises the point again by claiming to be "entitled to a judicial hearing upon . . . his allegation of fact in habeas corpus proceedings that the undisclosed and so-called confidential matter . . . was of such a character that its consideration was not authorized by applicable regulations established by the Attorney General." However, petitioner made no direct assertion in this Court with respect to prejudgment. In this state of the record we conclude that there is no claim of prejudgment before this Court. See n. 22, *infra.*

[7] No further administrative appeal was then available to petitioner. See 8 CFR, Rev. 1952, §§ 242.61 (e), 6.1 (b) (2), 6.1 (h) (1).

As previously noted, § 244 (a)(5) of the Act provides that the Attorney General "may, in his discretion" suspend deportation of any deportable alien who meets certain statutory requirements relating to moral character, hardship and period of residence within the United States. If the Attorney General does suspend deportation under that provision, he must file, pursuant to § 244 (c), "a complete and detailed statement of the facts and pertinent provisions of law in the case" with Congress, giving "the reasons for such suspension." So far as pertinent here, deportation finally cancels only if Congress affirmatively approves the suspension by a favorable concurrent resolution within a specified period of time. There is no express statutory grant of any right to a hearing on an application to the Attorney General for discretionary suspension of deportation. For purposes of effectuating these statutory provisions, the Attorney General adopted regulations delegating his authority under § 244 of the Act to special inquiry officers; [8] giving the alien the right to apply for suspension during a deportation hearing; [9] putting the burden on the applicant to establish the statutory requirements for eligibility for suspension; [10] allowing the alien-applicant to submit any evidence in support of his application; [11] requiring the special inquiry officer to present

---

[8] 8 CFR, Rev. 1952, § 242.6 quoted in part at note 3, *supra.* Petitioner does not suggest, nor can we conclude, that Congress expected the Attorney General to exercise his discretion in suspension cases personally. There is no doubt but that the discretion was conferred upon him as an administrator in his capacity as such, and that under his rulemaking authority, as a matter of administrative convenience, he could delegate his authority to special inquiry officers with review by the Board of Immigration Appeals. 66 Stat. 173, 8 U. S. C. § 1103.

[9] 8 CFR, Rev. 1952, § 242.54 (d).

[10] *Ibid.*

[11] *Ibid.*

evidence bearing on the applicant's eligibility for relief;[12] and requiring a "written decision" with "a discussion of the evidence relating to the alien's eligibility for such relief and the reasons for granting or denying such application."[13] The Attorney General also promulgated the regulation under attack here, 8 CFR, Rev. 1952, § 244.3, see pp. 347–348, *supra,* providing for the use by special inquiry officers and the Board of Immigration Appeals of confidential information in ruling upon suspension applications if disclosure of the information would be prejudicial to the public interest, safety or security.

We note that petitioner does not suggest that he did not receive a full and fair hearing on evidence of record with respect to his statutory eligibility for suspension of deportation. In fact, petitioner recognizes that the special inquiry officer found in his favor on all issues relating to eligibility for the discretionary relief and that those findings were adopted by the Board of Immigration Appeals.[14] This favorably disposed of petitioner's eligibility for consideration for suspension of deportation—the first step in the suspension procedure. Thus, we have here the case of an admittedly deportable alien who has been ordered deported following an unchallenged hearing, and who has been accorded another full and fair hearing on the issues respecting his statutory qualifications for discretionary suspension of deportation.

It is urged upon the Court that the confidential information regulation is invalid because inconsistent with § 244 of the Act. In support of this claim, petitioner argues that § 244 implicitly requires the Attorney General to give a hearing on applications for suspension of deportation. It is then said that this statutory right is nullified and rendered illusory by the challenged regula-

---

[12] 8 CFR, Rev. 1952, § 242.53 (c).

[13] 8 CFR, Rev. 1952, § 242.61 (a).

[14] See notes 4 and 5, *supra,* and accompanying text.

tion, and that therefore the regulation is invalid. But there is nothing in the language of § 244 of the Act upon which to base a belief that the Attorney General is required to give a hearing with all the evidence spread upon an open record with respect to the considerations which may bear upon his grant or denial of an application for suspension to an alien eligible for that relief. Assuming that the statute implicitly requires a hearing on an open record as to the specified statutory prerequisites to favorable action, there is no claim here of a denial of such a hearing on those issues. Moreover, though we assume a statutory right to a full hearing on those issues, it does not follow that such a right exists on the ultimate decision—the exercise of discretion to suspend deportation.

Eligibility for the relief here involved is governed by specific statutory standards which provide a right to a ruling on an applicant's eligibility. However, Congress did not provide statutory standards for determining who, among qualified applicants for suspension, should receive the ultimate relief. That determination is left to the sound discretion of the Attorney General. The statute says that, as to qualified deportable aliens, the Attorney General "may, in his discretion" suspend deportation.[15]

---

[15] Congress first provided for suspension of deportation in 1940 by adding a new provision to the Immigration Act of 1917. 54 Stat. 672, as amended, 62 Stat. 1206, 8 U. S. C. (1946 ed., Supp. V) § 155 (c). That new provision provided that "the Attorney General may . . . suspend deportation" under certain circumstances. In enacting the Immigration and Nationality Act of 1952, Congress added the phrase "in his discretion" after the words "the Attorney General may." In an analysis of draft legislation leading up to the 1952 Act, prepared by the Immigration and Naturalization Service for the assistance of the congressional committees, it was stated that the new words were suggested "in order to indicate clearly that the grant of suspension is entirely discretionary . . . ." That analysis was considered by the congressional committees. See S. Rep. No. 1137, 82d Cong., 2d Sess., p. 3; H. R. Rep. No. 1365, 82d Cong., 2d Sess., p. 28.

It does not restrict the considerations which may be relied upon or the procedure by which the discretion should be exercised. Although such aliens have been given a right to a discretionary determination on an application for suspension, cf. *Accardi* v. *Shaughnessy,* 347 U. S. 260, a grant thereof is manifestly not a matter of right under any circumstances, but rather is in all cases a matter of grace. Like probation or suspension of criminal sentence, it "comes as an act of grace," *Escoe* v. *Zerbst,* 295 U. S. 490, 492, and "cannot be demanded as a right," *Berman* v. *United States,* 302 U. S. 211, 213.[16] And this unfettered discretion of the Attorney General with respect to suspension of deportation is analogous to the Board of Parole's powers to release federal prisoners on parole.[17] Even if we assume that Congress has given to qualified applicants for suspension of deportation a right to offer evidence to the Attorney General in support of their applications, the similarity between the discretionary powers vested in the

---

[16] As stated by Judge Learned Hand, "The power of the Attorney General to suspend deportation is a dispensing power, like a judge's power to suspend the execution of a sentence, or the President's to pardon a convict." *United States ex rel. Kaloudis* v. *Shaughnessy,* 180 F. 2d 489, 491. See also S. Rep. No. 1137, 82d Cong., 2d Sess., p. 25, for an indication that suspension of deportation is a matter of grace to cover cases of unusual hardship. And see 81 Cong. Rec. 5546, 5553, 5554, 5561, 5569–5570, and 5572, where early proposed legislation for administrative suspension of deportation was variously described as a procedure for "clemency" and "amnesty," and was compared with presidential discretion. And see S. Rep. No. 1515, 81st Cong., 2d Sess., p. 600, emphasizing that suspension of deportation is an entirely discretionary action which does not follow automatically from compliance with the formal eligibility requirements.

[17] ". . . if in the opinion of the Board [of Parole] such release is not incompatible with the welfare of society, the Board *may in its discretion* authorize the release of such prisoner on parole." (Emphasis supplied.) 18 U. S. C. § 4203. See *United States* v. *Anderson,* 76 F. 2d 375, 376; *Losieau* v. *Hunter,* 90 U. S. App. D. C. 85, 193 F. 2d 41.

Attorney General by § 244 (a) of the Act on the one hand,
and judicial probation power and executive parole power
on the other hand, leads to a conclusion that § 244 gives no
right to the kind of a hearing on a suspension application
which contemplates full disclosure of the considerations
entering into a decision. Clearly there is no statutory
right to that kind of a hearing on a request for a grant
of probation after criminal conviction in the federal
courts.[18] Nor is there such a right with respect to an
application for parole.[19] Since, as we hold, the Attorney

---

[18] A sentencing court "may suspend . . . sentence and place the
defendant on probation" if it is "satisfied that the ends of justice
and the best interest of the public as well as the defendant will be
served thereby." 18 U. S. C. § 3651.

"The probation service of the court shall make a presentence
investigation and report to the court before the imposition of sen-
tence or the granting of probation . . . ." Rule 32 (c) (1), Fed.
Rules Crim. Proc. "The report of the presentence investigation
shall contain any prior criminal record of the defendant and such
information about his characteristics, his financial condition and the
circumstances affecting his behavior as may be helpful in imposing
sentence or in granting probation or in the correctional treatment of
the defendant, and such other information as may be required by
the Court." Rule 32 (c) (2), Fed. Rules Crim. Proc. "Before im-
posing sentence the court shall afford the defendant an opportunity
to make a statement in his own behalf and to present any information
in mitigation of punishment." Rule 32 (a), Fed. Rules Crim. Proc.

Cf. *Williams* v. *New York,* 337 U. S. 241, where this Court held
that there is no constitutional bar to setting a state criminal sentence
on the basis of "out-of-court information."

[19] "If it appears to the Board of Parole from a report by the proper
institutional officers or upon application by a prisoner eligible for
release on parole, that there is a reasonable probability that such
prisoner will live and remain at liberty without violating the laws,
and if in the opinion of the Board such release is not incompatible
with the welfare of society, the Board may in its discretion authorize
the release of such prisoner on parole." 18 U. S. C. § 4203 (a).

Note also that only certain prisoners are eligible for this discre-
tionary relief. 18 U. S. C. § 4202.

General's discretion is not limited by the suggested hearing requirement, the challenged regulation cannot be said to be inconsistent with § 244 (a) of the Act.

Petitioner says that a hearing requirement, with a consequent disclosure of all considerations going into a decision, is made implicit by § 244 (c) if not by § 244 (a). Section 244 (c), it will be recalled, requires the Attorney General to file with Congress "a complete and detailed statement of the facts" as to cases in which suspension is granted, "with reasons for such suspension." This statutory mandate does not, however, order such a report on cases in which suspension is denied. Section 244 (c) actually emphasizes the fact that suspension is not a matter of right. Congress was interested in limiting grants of this relief to the minimum. It evidenced an interest only in the reasons relied upon by the Attorney General for granting an application so that it could have an opportunity to accept or reject favorable administrative decisions. This in no way suggests that the applicant is to be apprised of the reasons for a denial of his request for suspension.

Petitioner also points to § 235 (c) of the Act, 8 U. S. C. § 1225 (c), which specifically authorizes the Attorney General to determine under some circumstances that an alien is excludable "on the basis of information of a confidential nature." [20] It is argued from this that had Congress intended to permit the use of confidential information in rulings upon applications for suspension of deportation, it would have expressly so provided in language as specific as that used in § 235 (c). The difficulty with this argument is that § 235 (c) is an exception to an express statutory mandate under § 236 (a) of the Act, 8 U. S. C. § 1226 (a), that determinations of admissibility

[20] See *Knauff* v. *Shaughnessy*, 338 U. S. 537, and *Shaughnessy* v. *Mezei*, 345 U. S. 206, upholding a regulation of the Attorney General to a similar effect which had been promulgated prior to the existence of § 235 (c) or any other such specific statutory authority.

be "based only on the evidence produced at the inquiry." No such express mandate exists with respect to suspension of deportation, and, therefore, no specific provision for the use of confidential information was needed if normally contemplated by the broad grant of discretionary power to the Attorney General.

It is next argued that, even if the confidential information regulation is not inconsistent with § 244 (a), it nevertheless should be held invalid. Emphasizing that Congress did not in terms authorize such a procedure, petitioner contends that the Act should be construed to provide a right to a hearing because only such a construction would be consistent with the "tradition and principles of free government." [21] On its face this is an attractive argument. Petitioner urges that, in view of the severity of the result flowing from a denial of suspension of deportation, we should interpret the statute by resolving all doubts in the applicant's favor. Cf. *United States* v. *Minker,* 350 U. S. 179, 187–188. But we must adopt the plain meaning of a statute, however severe the consequences. Cf. *Galvan* v. *Press,* 347 U. S. 522, 528. As we have already stated, suspension of deportation is not given to deportable aliens as a right, but, by congressional direction, it is dispensed according to the unfettered

---

[21] It is not claimed that a contrary construction would render the statute and regulation unconstitutional, or even that a substantial constitutional question would thereby arise. The thrust of the argument is rather that the statute should be construed liberally in favor of the alien as a matter of statutory interpretation. In any event, in this case we have not violated our normal rule of statutory interpretation that, where possible, constructions giving rise to doubtful constitutional validity should be avoided. That rule does not authorize a departure from clear meaning. *E. g., United States* v. *Sullivan,* 332 U. S. 689, 693; *Hopkins Federal Savings & Loan Assn.* v. *Cleary,* 296 U. S. 315, 334–335. Moreover, the constitutionality of § 244 as herein interpreted gives us no difficulty. Cf. *Williams* v. *New York,* 337 U. S. 241.

discretion of the Attorney General. In the face of such a combination of factors we are constrained to construe the statute as permitting decisions based upon matters outside the administrative record, at least when such action would be reasonable.

It may be that § 244 (a) cannot be interpreted as allowing a decision based on undisclosed information in every case involving a deportable alien qualified for suspension. Thus, it could be argued that, where there is no compelling reason to refuse to disclose the basis of a denial of an application, the statute does not contemplate arbitrary secrecy. However, the regulation under attack here limits the use of confidential information to instances where, in the opinion of the special inquiry officer or the Board of Immigration Appeals, "the disclosure . . . would be prejudicial to the public interest, safety, or security." If the statute permits any withholding of information from the alien, manifestly this is a reasonable class of cases in which to exercise that power.[22]

Our conclusion in this case is strongly supported by prior decisions of this Court. In both *Knauff* v. *Shaughnessy*, 338 U. S. 537, and *Shaughnessy* v. *Mezei*, 345 U. S. 206, we upheld a regulation of the Attorney General calling for the denial of a hearing in exclusion cases where the Attorney General determined that an alien was ex-

---

[22] Petitioner presents the claim that the decision of the special inquiry officer was void in that the "so-called confidential matter . . . was of such a character that its consideration was not authorized by applicable regulations established by the Attorney General." See note 6, *supra*. To the extent that this is an allegation that the undisclosed information, if revealed, would not have been prejudicial to the public interest, petitioner is arguing that the decision violated 8 CFR, Rev. 1952, § 244.3. The Board of Immigration Appeals, the District Court, and the Court of Appeals concluded, in effect, that the special inquiry officer found that the disclosure of the information would have been contrary to public interest, safety or security. We accept that finding. Nothing more is required by the regulation.

cludable on the basis of confidential information, and where, as here, the disclosure of that information would be prejudicial to the public interest.[23] And again, as here, the statutes involved in those cases did not expressly authorize the use of such information in making the administrative ruling. It is true that a resident alien in a deportation proceeding has constitutional protections unavailable to a nonresident alien seeking entry into the United States, and that those protections may militate against construing an ambiguous statute as authorizing the use of confidential information in a deportation proceeding. Cf. *Kwong Hai Chew* v. *Colding*, 344 U. S. 590. But the issue involved here under § 244 (a) is not whether an alien is deportable, but whether, as a deportable alien who is qualified for suspension of deportation, he should be granted such suspension. In view of the gratuitous nature of the relief, the use of confidential information in a suspension proceeding is more clearly within statutory authority than were the regulations involved in the *Knauff* and *Mezei* cases.

Concluding that the challenged regulation is not inconsistent with the Act, we must look to petitioner's claim that the use of undisclosed confidential information is unlawful because inconsistent with related regulations governing suspension of deportation procedures. As previously noted, an application for suspension is considered as part of the "hearing" to determine deportability. 8 CFR, Rev. 1952, §§ 242.53 (c) and 242.54 (d); and see 8 CFR, Rev. 1952, § 242.5. The alien is entitled to "submit any evidence in support of his application which he believes should be considered by the special inquiry officer." 8 CFR, Rev. 1952, § 242.54 (d). The hearing to determine deportability, during which the sus-

---

[23] The substance of this regulation is now incorporated in § 235 (c) of the Act, 8 U. S. C. § 1225 (c). See pp. 356–357, *supra*.

pension application is considered, is to be a "fair and impartial hearing." 8 CFR, Rev. 1952, § 242.53 (b). And a decision of the special inquiry officer on the request for suspension must contain "the reasons for granting or denying such application." 8 CFR, Rev. 1952, § 242.61 (a).

We conclude that, although undisclosed information was used as a basis for denying suspension of deportation, none of the above-mentioned regulations was transgressed. While an applicant for suspension is, by regulation, entitled to "submit any evidence in support of his application," that is merely a provision permitting an evidentiary plea to the discretion of those who are to make the decision. In this respect it is not unlike the "statement" and the opportunity to present "information in mitigation of punishment" to which a convicted defendant is entitled under Rule 32 (a) of the Federal Rules of Criminal Procedure before criminal sentence is imposed.[24] And the situation is not different because the matter of suspension of deportation is taken up in the "fair and impartial" deportation "hearing." Assuming that such a "hearing" normally precludes the use of undisclosed information, the "hearing" here involved necessarily contemplates the use of confidential matter in some circumstances. We must read the body of regulations governing suspension procedures so as to give effect, if possible, to all of its provisions. Cf. *Lawson* v. *Suwannee Fruit & S. S. Co.,* 336 U. S. 198.

This same rationale leads us to conclude that the requirement of a decision containing "reasons" is fully complied with by a statement to the effect that the application has been denied on the basis of confidential information, the disclosure of which would be prejudicial to the public interest, safety or security. Section 244.3 says

---

[24] See note 18, *supra.*

that such information may be used "without the disclosure thereof to the applicant." Reading the provision for a statement of the "reasons" for a decision in the light of § 244.3, it follows that express reliance on confidential information constitutes a statement of the "reasons" for a denial of suspension within the meaning of § 242.61 (a). If "reasons" must be disclosed but confidential information need not be, the former mandate, which certainly comprehends the latter provision, must be satisfied by an express invocation of the latter provision.

Congress has provided a general plan dealing with the deportation of those aliens who have not obtained citizenship although admitted to residence. Since it could not readily make exception for cases of unusual hardship or extenuating circumstances, those matters were left to the consideration and discretion of the Attorney General. We hold that in this case the Attorney General has properly exercised his powers under the suspension statute and we affirm the judgment below.

*It is so ordered.*

MR. CHIEF JUSTICE WARREN, dissenting.

In conscience, I cannot agree with the opinion of the majority. It sacrifices to form too much of the American spirit of fair play in both our judicial and administrative processes.

In the interest of humanity, the Congress, in order to relieve some of the harshness of the immigration laws, gave the Attorney General discretion to relieve hardship in deportation cases. I do not believe it was "an unfettered discretion," as stated in the opinion. It was an administrative discretion calling for a report to Congress on the manner of its use. The Attorney General, recognizing this, rightfully provided for an administrative hearing for the exercise of that discretion. On the other hand, he provided by his regulation that his numerous

subordinate hearing officers might, in spite of a record clearly establishing a right to relief, deny that relief if, on the basis of undisclosed "confidential" information, the relief would in their opinion be "prejudicial to the public interest, safety, or security." Such a hearing is not an administrative hearing in the American sense of the term. It is no hearing.

Yet, on the basis of such "confidential" information, after more than 40 years of residence here, we are tearing petitioner from his relatives and friends and from the country he fought to sustain,* when the record shows he has not offended against our laws, bears a good reputation, and would suffer great hardship if deported. Petitioner is not a citizen of the United States, but the Due Process Clause protects "persons." To me, this is not due process. If sanction of this use and effect of "confidential" information is confirmed against this petitioner by a process of judicial reasoning, it may be recognized as a principle of law to be extended against American citizens in a myriad of ways.

I am unwilling to write such a departure from American standards into the judicial or administrative process or to impute to Congress an intention to do so in the absence of much clearer language than it has used here.

Mr. Justice Black, dissenting.

This is a strange case in a country dedicated by its founders to the maintenance of liberty under law. The petitioner, Cecil Reginald Jay, is being banished because he was a member of the Communist Party from 1935 to 1940. His Communist Party membership at that time did not violate any law. The Party was recognized then

---

*Petitioner's only absence from this country since his original entry in 1914 was during World War I to serve in the Armed Forces of our neighbor and ally, the Dominion of Canada.

as a political organization and had candidates in many state elections. Jay's Communist Party membership ended 10 years before such membership was made a ground for deportation by Congress. 64 Stat. 1006–1008. It is for this past Communist membership, wholly legal when it existed, that Jay has been ordered deported.[1]

Even though an alien has been found to be deportable, Congress has provided a procedure which he can invoke to have his deportation suspended. 66 Stat. 163, 214–216, 8 U. S. C. §§ 1254 (a)(5), 1254 (c). He is entitled to suspension "in the discretion" of the Attorney General if he "proves" that during the preceding 10 years he has been a person of good moral character and if deportation would result in exceptional and unusual hardship. The language of the statute plainly shows that an alien must be given an opportunity to "prove" these things if he can. This of course means that he must have a full and fair hearing. Jay asked to be allowed to give such proof and in fact proved his case to the complete satisfaction of the hearing officer who passed on it. But the hearing officer "after considering confidential information" refused to suspend deportation. The Board of Immigration Appeals dismissed Jay's appeal.

---

[1] The constitutionality of this Act authorizing deportation for conduct legal when it occurred was sustained in *Galvan* v. *Press*, 347 U. S. 522. MR. JUSTICE DOUGLAS and I dissented. On April 6, 1953, President Eisenhower sent a message to Senator Arthur V. Watkins calling attention to the harshness of the immigration laws which were used here to deport Jay. In listing "injustices" claimed to exist in the legislation President Eisenhower referred to:

"Deportation provisions that permit an alien to be deported at any time after entry, irrespective of how long ago he was involved, after entry, in an active or [*sic*] affiliation designated as 'subversive.' Such alien is now subject to deportation even if his prior affiliation was terminated many years ago and he has since conducted himself as a model American." 99 Cong. Rec. 4321.

364

Jay is now 65 years of age. He came to this country from England for permanent residence in 1914. He has remained here ever since except for time he served in the army of our ally Canada during the First World War. Despite the Government's far-flung investigative network it has not been able to dig up one single incident of misconduct on the part of Jay during his entire 65 years which it is willing to produce in court.[2] That Jay is a person of good moral character and that his enforced exile from this country will work an "exceptional and extremely unusual hardship" have been found by the hearing officer.

I agree with THE CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS that the Attorney General's regulation authorizing Jay and others like him to be deported upon alleged anonymous information should be held invalid as beyond the statutory power of the Attorney General. But a majority of the Court holds otherwise. This makes it necessary to consider the constitutionality of the use of anonymous information for such a purpose. In Footnote 21 of its opinion the Court states, somewhat as an aside, that "the constitutionality of § 244 as herein interpreted gives us no difficulty." In this easy fashion the Court disposes of a challenge to the power of Congress to banish people

---

[2] Included in the testimony for Jay was an affidavit by the Assistant Executive Director for the Seattle Housing Authority which employed him, stating:

"Mr. Jay was rated as one of the most conscientious and faithful employees of this Authority. His honesty was unquestioned. His interest in his work extended beyond the normal working hours and he was always willing to accept additional responsibilities without additional compensation. He was forthright in his opinions. His general moral character is evidenced by the fact that during his entire period of employment not one complaint was ever received from either the tenants or his fellow employees as to his relationships with people."

on information allegedly given federal officers by persons whose names are not revealed and whose statements (if made) are shrouded in the darkness which surrounds "confidential information."

What is meant by "confidential information"? According to officers of the Immigration Service it may be "merely information we received off the street"; or "what might be termed as hearsay evidence, which could not be gotten into the record . . ."; or "information from persons who were in a position to give us the information that might be detrimental to the interests of the Service to disclose that person's name . . ."; or "such things, perhaps, as income-tax returns, or maybe a witness who didn't want to be disclosed, or where it might endanger their life, or something of that kind . . . ." [3] No nation can remain true to the ideal of liberty under law and at the same time permit people to have their homes destroyed and their lives blasted by the slurs of unseen and unsworn informers. There is no possible way to contest the truthfulness of anonymous accusations. The supposed accuser can neither be identified nor interrogated. He may be the most worthless and irresponsible character in the community. What he said may be wholly malicious, untrue, unreliable, or inaccurately reported. In a court of law the triers of fact could not even listen to such gossip, much less decide the most trifling issue on it.

The Court today is not content with allowing exile on the basis of anonymous gossip. It holds that the hearing officer who condemned Jay could act in his "unfettered discretion," subject only to review by the Board of Immigration Appeals. Of course the Court refers to the

---

[3] Hearings before House Subcommittee on Legal and Monetary Affairs of the Committee on Government Operations: Practices and Procedures of the Immigration and Naturalization Service in Deportation Proceedings, 84th Cong., 1st Sess. 18, 67, 138, 207.

Attorney General's "unfettered discretion," but participation of the Attorney General in this case is a fiction. The Court concedes in Note 8 of its opinion that the Attorney General does not personally exercise discretion in these cases. Therefore, the "unfettered discretion" to which the Court subjects persons like Jay is the unfettered discretion of inquiry officers of the Immigration Service, reviewable only by the Board of Immigration Appeals. Under our system of government there should be no way to subject the life and freedom of one individual to the "unfettered" or, more accurately, the "arbitrary" power of another. Article III of our Constitution and the Bill of Rights intend that people [4] shall not have valuable rights and privileges taken away from them by government unless the deprivation occurs after some kind of court proceeding where witnesses can be confronted and questioned and where the public can know that the rights of individuals are being protected.

Unfortunately, this case is not the first one in recent years where arbitrary power has been approved and where anonymous information has been used to take away vital rights and privileges of people.[5] The Court disposes of what has been done to Jay to its satisfaction by saying that his right to stay here if he proves he is a good

---

[4] The fact that Jay is an alien should not mean that he is outside the protection of the Constitution. As Mr. Justice Brewer said in dealing with whether aliens are protected by the first 10 Amendments: "It is worthy of notice that in them the word 'citizen' is not found. In some of them the descriptive word is 'people,' but in the Fifth it is broader, and the word is 'person,' and in the Sixth it is the 'accused,' while in the Third, Seventh, and Eighth there is no limitation as to the beneficiaries suggested by any descriptive word." *Fong Yue Ting* v. *United States*, 149 U. S. 698, 739 (dissenting).

[5] See, *e. g.*, *Ludecke* v. *Watkins*, 335 U. S. 160; *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537; *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206; *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123; *Carlson* v. *Landon*, 342 U. S. 524.

citizen "comes as an act of grace," like "probation or suspension of criminal sentence." But probation and suspension of criminal sentence come only after conviction of crime. Cf. *Williams* v. *New York*, 337 U. S. 241. Here the Government with all of its resources has not been able to prove that Jay ever committed a crime of any kind. And Congress provided the suspension procedure so that one in Jay's situation could get special relief if he proved his good moral character. Viewed realistically this suspension procedure is an integral part of the process of deciding who shall be deported.

No amount of legal reasoning by the Court and no rationalization that can be devised can disguise the fact that the use of anonymous information to banish people is not consistent with the principles of a free country. Unfortunately there are some who think that the way to save freedom in this country is to adopt the techniques of tyranny. One technique which is always used to maintain absolute power in totalitarian governments is the use of anonymous information by government against those who are obnoxious to the rulers.[6] In connection with another case like this[7] I referred to a statement made by the Roman Emperor Trajan to Pliny the Younger around the end of the First Century. Rome

---

[6] Recently Nikita Khrushchev is reported to have told the 20th Communist Party Congress that Stalin violated:

". . . all existing norms of morality and of Soviet laws.

"Arbitrary behavior by one person encouraged and permitted arbitrariness in others. Mass arrests and deportations of many thousands of people, execution without trial and without normal investigation created conditions of insecurity, fear and even desperation.

. . . . .

". . . honest Communists were slandered, accusations against them were fabricated, and revolutionary legality was gravely undermined." Department of State Press Release, June 4, 1956, pp. 8–9, 14; Washington Post & Times Herald, June 6, 1956, p. 11, cols. 1, 6.

[7] *Carlson* v. *Landon*, 342 U. S. 524, 552 (dissenting opinion).

at that time was prosecuting the Christians for alleged subversive activities. Pliny expressed his doubts to Trajan as to the best method of handling the prosecutions. He wrote Trajan, "An anonymous information was laid before me containing a charge against several persons, who upon examination denied they were Christians, or had ever been so. . . ." Trajan replied, "You have adopted the right course, my dearest Secundus, in investigating the charges against the Christians who were brought before you. . . . Anonymous informations ought not to be received in any sort of prosecution. It is introducing a very dangerous precedent, and is quite foreign to the spirit of our age." [8]

It was also foreign to the brave spirit of the American age that gave birth to our constitutional system of courts with their comprehensive safeguards for fair public trials. In those courts a defendant's fate is to be determined by independent judges and juries who hear evidence given by witnesses in their presence and in the presence of the accused.[9] But this case shows how far we have departed from the carefully conceived plan to safeguard individual liberty. Although the Court today pays lip service to judicial review, a hearing officer's condemnation of Jay is held final and unreviewable. His condemnation is in open defiance of all the public testimony given, and rests exclusively on "confidential information" he claims to have received from unrevealed sources. Unfortunately this condemnation of Jay on anonymous information is not unusual—it manifests the popular fashion in these days of fear. Legal rationalizations [10] have been con-

---

[8] 9 Harvard Classics 426–428.

[9] See *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11; *In re Oliver,* 333 U. S. 257. Cf. *Kinsella* v. *Krueger,* 351 U. S. 470; *Reid* v. *Covert,* 351 U. S. 487.

[10] As Mr. Justice Bradley said for the Court in *Boyd* v. *United States,* 116 U. S. 616, 635, "[I]llegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches

trived to shift trials from constitutional courts to temporary removable appointees like the hearing officer who decided against Jay.[11] And when an accused rises to defend himself before such an officer he is met by a statement that "We have evidence that you are guilty of something, but we cannot tell you what, nor who gave us the evidence." If, taking the Bill of Rights seriously, he complains, he is met by the rather impatient rejoinder that the Government's safety would be jeopardized by according him the kind of trial the Constitution commands.[12] But the core of our constitutional system is

---

and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. . . ." See also dissenting opinion of Mr. Justice Brewer in *Fong Yue Ting* v. *United States*, 149 U. S. 698, 744.

[11] See *Shaughnessy* v. *United States ex rel. Accardi*, 349 U. S. 280, 290–293 (dissenting); *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 17.

[12] The destruction of judicial protections for fair and open determinations of guilt is an essential to maintenance of dictatorships. After the murderous purge of hundreds of German citizens Hitler said: "If anyone reproaches me and asks why I did not resort to the regular courts of justice for conviction of the offenders, then all that I can say to him is this: in this hour I was responsible for the fate of the German people, and thereby I became the supreme Justiciar of the German people!

". . . If people bring against me the objection that only a judicial procedure could precisely weigh the measure of the guilt and of its expiation, then against this view I lodge my most solemn protest. He who rises against Germany is a traitor to his country: and the traitor to his country is not to be punished according to the range and the extent of his act, but according to the purpose which that act has revealed." Speech delivered by Hitler in the Reichstag on 13 July 1934, 1 Hitler's Speeches (Baynes ed. 1942), 321–323.

The Russian purges of the 1930's are reported to have been gov-

370

that individual liberty must never be taken away by shortcuts, that fair trials in independent courts must never be dispensed with. That system is in grave danger. This case emphasizes that fact. Prosecution of any sort on anonymous information is still too dangerous, just as it was when Trajan rejected it nearly two thousand years ago. Those who prize liberty would do well to ponder this.

MR. JUSTICE FRANKFURTER, dissenting.

Since the petitioner was found deportable under the Act of Oct. 16, 1918, 40 Stat. 1012, 8 U. S. C. § 137, as amended, 64 Stat. 1006, 1008, 8 U. S. C. (1946 ed., Supp. V) § 137–3, his deportation would follow automatically had not Congress, in § 244 (a)(5) of the Immigration and Nationality Act of 1952, entrusted the Attorney General with the power of relaxing this dire consequence by suspending the deportation. 66 Stat. 163, 214, 8 U. S. C. § 1254 (a)(5). This the Attorney General is authorized to do if the petitioner has been present in the United States for at least ten years since the grounds for his deportation arose, if he can prove that during all of such period he has been and is a person of good moral character, and, finally, if his deportation would, in the opinion of the Attorney General, "result in exceptional and ex-

---

erned by a directive initiated by Stalin, which stated:

"I. Investigative agencies are directed to speed up the cases of those accused of the preparation or execution of acts of terror.

"II. Judicial organs are directed not to hold up the execution of death sentences pertaining to crimes of this category in order to consider the possibility of pardon, because the Presidium of the Central Executive Committee USSR does not consider as possible the receiving of petitions of this sort.

"III. The organs of the Commissariat of Internal Affairs are directed to execute the death sentences against criminals of the above-mentioned category immediately after the passage of sentences." Department of State Press Release, June 4, 1956, p. 15; Washington Post & Times Herald, June 6, 1956, p. 11, cols. 7–8.

tremely unusual hardship." If the Attorney General finds that all three conditions are satisfied, he "may, in his discretion, suspend deportation." Such is the feature of mitigation with which Congress qualified what obviously is, and was designed to be, a very drastic exercise of its constitutional power to turn aliens out of the country for some past misdeed, often unthinking foolishness, and, it may well be, long after genuine repentance and the evolution of the alien into a worthy member of society.

By this provision, Congress plainly responded to the dictates of humanity. But, just as Congress could have exercised to the utmost its power of constitutional severity, so it could appropriately define the mode for its alleviation. It has seen fit to make the Attorney General the agent for its quality of mercy, to be exercised by him "in his discretion." The power of dispensation given the Attorney General he can, I have no doubt, withhold without accounting to anyone, and certainly without recourse to judicial review. Congress was evidently content to leave to the conscience of the chief law officer of the Government, the head of the Department of Justice, both the carrying out of its humane purpose and the protection of the public interest.

If the Attorney General's conscience is satisfied to act on considerations that he does not desire to expose to the light of day or to impart to an alien whose liberty may be at stake, thereby involving the fate of an innocent family, Congress leaves him free to do so. But Congress has not seen fit to invest his subordinates with such arbitrary authority over the lives of men.

One is not unmindful of the fact that the Attorney General is burdened with a vast range of duties, and that he, too, has only twenty-four hours in a day. To be sure, one of his predecessors in the administration of our immigration laws, President Taft's Secretary of Commerce and Labor, himself examined every deportation file in which

an appeal was lodged. And Alfred E. Smith cannot have been the only Governor to read the records in the hundreds of applications that came before him each year for executive clemency. But, if in his wisdom the Attorney General devises a system for delegating the means for carrying out the responsibility for which Congress has given him discretion, he cannot also delegate his discretion. (That the nature of a delegated power may preclude redelegation, see, *e. g.*, the Canadian case, *Attorney-General of Canada* v. *Brent,* (1956) 2 D. L. R. (2d) 503, affirming [1955] 3 D. L. R. 587.)

If the Attorney General devises, as he has devised, an administrative system for effectuating § 244 (a) (5) of the Act of 1952, administrative arbitrariness is ruled out. If the Attorney General invokes the aid of administrative law, as he has done by establishing a procedure before a special inquiry officer of the Immigration and Naturalization Service and a review of that officer's decision by the Board of Immigration Appeals, these two agencies of administrative law cannot be authorized to defy the presuppositions of a fair hearing. The Attorney General may act on confidential information and Congress has left him to square it with his conscience. But he cannot shelter himself behind the appearance of legal procedure— a system of administrative law—and yet infuse it with a denial of what is basic to such a system. See, *e. g., Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, 300.

President Eisenhower has explained what is fundamental in any American code. A code devised by the Attorney General for determining human rights cannot be less than Wild Bill Hickok's code in Abilene, Kansas:

> "It was: meet anyone face to face with whom you disagree. You could not sneak up on him from behind, or do any damage to him, without suffering the penalty of an outraged citizenry. If you met

him face to face and took the same risks he did, you could get away with almost anything, as long as the bullet was in the front.

"And today, although none of you has the great fortune, I think, of being from Abilene, Kansas, you live after all by that same code, in your ideals and in the respect you give to certain qualities. In this country, if someone dislikes you, or accuses you, he must come up in front. He cannot hide behind the shadow. He cannot assassinate you or your character from behind, without suffering the penalties an outraged citizenry will impose." Press release of remarks of the President, on November 23, 1953, on receiving America's Democratic Legacy Award at dinner on the occasion of the 40th anniversary of the Anti-Defamation League.

For me, the philosophy embodied in these remarks rules the situation before us. The petitioner sustained the burden which the statute put upon him to prove himself deserving to remain in this country and to save his family from being disrupted. On the record, the Attorney General's special inquiry officer found that the respondent "appears to be qualified for suspension of deportation," and this finding was not upset on appeal. But this finding for the petitioner was nullified on the basis of some "confidential information." The petitioner had no means of meeting this "confidential information." We can take judicial notice of the fact that in conspicuous instances, not negligible in number, such "confidential information" has turned out to be either baseless or false. There is no reason to believe that only these conspicuous instances illustrate the hazards inherent in taking action affecting the lives of fellow men on the basis of such information. The probabilities are to the contrary. A system of administrative law cannot justify itself on the assumption that the "confidential information" avail-

able to these inquiry officers and the Board of Appeals is impregnable or even likely to be true. When the Attorney General scrutinizes "confidential information," at all events it is the Attorney General who does so. If he is unable to carry out the discretion vested solely in him to act on whatever he chooses to act upon, he must either devise a sifting process that meets the elementary decencies of procedure or advise Congress of his inability to carry out the extraordinary responsibility which it has reposed in him and not in his subordinates.

I would reverse.

MR. JUSTICE DOUGLAS, dissenting.

The statement that President Eisenhower made in 1953 on the American code of fair play is more than interesting Americana. As my Brother FRANKFURTER says, it is Americana that is highly relevant to our present problem. The President said: "In this country, if someone dislikes you, or accuses you, he must come up in front. He cannot hide behind the shadow. He cannot assassinate you or your character from behind, without suffering the penalties an outraged citizenry will impose." [1]

---

[1] The entire statement made at the B'Nai B'Rith Dinner in Washington, D. C., November 23, 1953, reads as follows:

"Why are we proud? We are proud, first of all, because from the beginning of this Nation, a man can walk upright, no matter who he is, or who she is. He can walk upright and meet his friend—or his enemy; and he does not feel that because that enemy may be in a position of great power that he can be suddenly thrown in jail to rot there without charges and with no recourse to justice. We have the habeas corpus act, and we respect it.

"I was raised in a little town of which most of you have never heard. But in the West it is a famous place. It is called Abilene, Kansas. We had as our Marshal for a long time a man named Wild Bill Hickock. If you don't know anything about him, read your Westerns more. Now that town had a code, and I was raised as a boy to prize that code.

"It was: meet anyone face to face with whom you disagree. You

That bit of Americana is relevant here because we have a question as to what a "hearing" is in the American meaning of the word. Fairness, implicit in our notions of due process, requires that any "hearing" be full and open with an opportunity to know the charge and the accusers, to reply to the charge, and to meet the accusers. And when Congress provides for a hearing, as it implicitly has in § 244 of the present Act, it should be assumed that Congress has the same lively sense of the requirements of fair play as the Eisenhower code demands.

The philosophy of the full hearing, especially as it involves the right to meet the accusers, has been put in classical words by Professor Zechariah Chafee, Jr., in his recent book The Blessings of Liberty (1956), p. 35:

> "One important benefit from confronting the suspect with his accusers is the opportunity to cross-examine them and rigorously test any dubious statement. As old Sir Matthew Hale says, it 'beats and boults out the truth much better.' Add to that the old-fashioned value of putting people face to face out in the open. Accusers who secretly confer in private with an official or two and a couple of clerks may, as in Hale's time, 'oftentimes deliver that which they will be ashamed to testify publicly.' An honest witness may feel quite differently when he has to re-

could not sneak up on him from behind, or do any damage to him, without suffering the penalty of an outraged citizenry. If you met him face to face and took the same risks he did, you could get away with almost anything, as long as the bullet was in the front.

"And today, although none of you has the great fortune, I think, of being from Abilene, Kansas, you live after all by that same code, in your ideals and in the respect you give to certain qualities. In this country, if someone dislikes you, or accuses you, he must come up in front. He cannot hide behind the shadow. He cannot assassinate you or your character from behind, without suffering the penalties an outraged citizenry will impose."

peat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is. As for the false witness, the tribunal can learn ever so much more by looking at him than by reading an F. B. I. abstract of his story. The pathological liar and the personal enemy can no longer hide behind a piece of paper."

And see *Peters* v. *Hobby,* 349 U. S. 331, 350–352; O'Brian, National Security and Individual Freedom (1955), pp. 61–63.

Harry P. Cain, member of the Subversive Activities Control Board, recently joined the President in endorsing this code of fair play: [2]

"In all of our traditional efforts to protect the individual against oppression and false conviction by the state, we have relied basically and primarily on confrontation and cross-examination. By no other means can those who must judge their fellow man minimize to the fullest and desired extent the mistakes which humans make. Without recourse to these means, it is impossible for anyone accused of anything to protect himself fully against enemies whose evidence may consist of nothing more than malice, vindictiveness, mistaken identity, intolerance, prejudice, or a perverted desire to destroy."

A hearing is not a hearing in the American sense if faceless informers or confidential information may be used to deprive a man of his liberty. That kind of hearing is so un-American that we should lean over backwards to avoid imputing to Congress a purpose to sanction it under § 244.

---

[2] Address before New York Civil Liberties Union, New York City, February 22, 1956.