Marin RADIC, Plaintiff,

v.

Cecil W. FULLILOVE, Acting District Director, San Francisco District, United States Immigration and Naturalization Service, Defendant.

Civ. No. 8154.

United States District Court
N. D. California, N. D.

Oct. 10, 1961.

Walter C. Frame and Robert N. Zarick, Sacramento, Cal., for plaintiff.

Cecil F. Poole, U. S. Atty., and Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for defendant.

HALBERT, District Judge.

Plaintiff is a native of Yugoslavia. He last entered this country as a seaman in 1945. He overstayed the time during which he was legally permitted to remain in this country, under the terms of his entry permit. In 1959, he voluntarily appeared at the Sacramento office of the Immigration and Naturalization Service, and sought permission to remain in this country as a legal permanent resident.

On March 30, 1960, it was ordered that plaintiff be deported to Yugoslavia. Plaintiff then applied for a stay of deportation under the provisions of Title 8 U.S.C.A. § 1253(h). Plaintiff contends that he is a Catholic, a believer in capitalism, and an anti-communist; that he did not return to Yugoslavia at the conclusion of the Second World War; and that for these reasons he will be subject to physical persecution if he returns to Yugoslavia. A Hearing Examiner (Special Inquiry Officer) conducted a hearing in which plaintiff offered evidence to substantiate his contentions.

Following is a summary of the pertinent evidence offered by plaintiff in support of his contentions.

In 1941, prior to the German attack on Yugoslavia, plaintiff was a seaman. He and his brother owned a farm near Split in Dalmatia, Yugoslavia. Plaintiff's wife and two children lived on the family farm with plaintiff's brother, *his* wife and family. Plaintiff had not been in Yugoslavia since 1934.

Service records show that plaintiff entered the United States as a seaman in 1941. He was once deported, in 1943, under an order which allowed him to re-enter the United States from time to time as a seaman. After his last entry in June, 1945, plaintiff illegally remained in this country, working as a cook.

Plaintiff testified that in 1945 he sent a telegram inquiring about his family. His wife, in reply, wrote that she, plaintiff's two children, plaintiff's brother and his family, all had been in a concentration camp for two years. Upon their return home, they found that the government in Yugoslavia had confiscated the crops and animals on the farm, a boat and fishing equipment. His family has opposed the totalitarian communistic government of Yugoslavia, and has continued to profess the Roman Catholic faith. As a result, they have been criticized by supporters of the regime, and have been subjected to reprisals, incarceration, confiscation of property and in some instances even death. Plaintiff's four cousins were taken from their home in the night and killed. Plaintiff's family has frequently sent him messages to the effect that the police and supporters of the regime had been inquiring after him, and were threatening to kill him. One message to this effect was transmitted by George Mikovich, who visited Yugoslavia in 1957 with his wife. Six letters to this effect were introduced, from plaintiff's wife, daughter, aunt, nephew and son-in-law. The son-in-law wrote that two men, Marko Lusic and Marko Vidovic, had come to Yugoslavia from America and

said that life in America was good. As a result, they were killed.

Marko Jakupak, a native of Yugoslavia, testified that he left there in 1957 and entered the United States in 1959. He testified that he had been beaten in 1948 for coming out of a Catholic Church wearing clothes made in America. He testified that since plaintiff had not returned to Yugoslavia since 1945, he was registered there as an enemy of the regime. He further testified that if plaintiff were to return to Yugoslavia, it would be dangerous for him [plaintiff] because he is anti-communist and is weathy to a certain extent.

Simon Stiakovich testified that he left Yugoslavia in 1955, that Yugoslavs who were out of the country and did not return after the Second World War are registered as anti-communists; that the position of anti-communists in Yugoslavia is very critical; and that Stiakovich's brother has been in jail for eight months of a one-year sentence for trying to leave the country.

A. L. Chargin, who left Yugoslavia in 1907, testified that he has often heard from people who had been in Yugoslavia (either Yugoslav-Americans who visited the country or refugees from the country) that conditions there are bad. There is no food, business or work. Atrocities are frequently committed there and especially in Dalmatia. The children are taught to inform on their parents, in classic communist style. Anti-communists are taken from their homes at night, and no one ever hears what happened to them, but they are never seen again.

Finally, plaintiff submitted a newspaper article relating the story of a man who had been born in the Dalmatian section of Yugoslavia, and had returned to Dalmatia voluntarily as a dedicated communist, but had become disenchanted with the regime and tried to return to America. For this he was killed.[1]

---

1. This article was given little or no credence by the Examiner, as the newspaper from which it was taken was avowedly

dedicated to publishing anti-communist propaganda.

So far as can be ascertained, no evidence was offered to show that plaintiff *could* return to Yugoslavia without physical persecution. The Hearing Examiner "carefully considered everything submitted by the applicant [plaintiff]," together with the contents of a file containing information relating to conditions in Yugoslavia. This file came from the regional office of the Immigration and Naturalization Service, and the documents in it were signed by some person whose name or identity the Examiner could not remember. This file is private information. There is, however, no indication that there is a security classification on it. It simply is kept confidential by the Immigration and Naturalization Service.

■ The evidence relating to the file in question was elicited from the Hearing Examiner in this Court, over objection from the Government. The objection of the Government was reserved for a ruling at this time. This evidence goes right to the heart of the (due process) issue before the Court. It is, therefore, admissible. The Government's objection to it is overruled. The testimony of the Hearing Examiner was the only evidence, outside of the agency record, which was submitted in this Court. The Hearing Examiner testified that he had no instructions as to what the outcome of the case should be, beforehand.

The Hearing Examiner, at the conclusion of the hearing which he held, recommended that the application be denied. Notwithstanding the evidence summarized above, the Hearing Examiner concluded that plaintiff had not proved that he would be subject to physical persecution if he were deported to Yugoslavia. The Regional Commissioner of the Immigration and Naturalization Service adopted the Hearing Examiner's recommendation and denied plaintiff's applica-

tion. To make the record complete, it should be noted that prior to the final decision of the Regional Commissioner, plaintiff was given the opportunity to make recommendations to the Regional Commissioner, but plaintiff was at no time given an opportunity to examine, attack or refute the documents in the file which the Hearing Examiner admittedly considered. The record does not disclose whether the file was before the Regional Commissioner when he made the final decision. It does appear, however, that the file was forwarded to the Regional Commissioner (See: 8 C.F.R. § 243.3(b)(2)).

The question before this Court is whether plaintiff was accorded procedural due process, that is, whether the procedure was essentially fair (Cakmar v. Hoy, 9 Cir., 265 F.2d 59; United States ex rel. Dolenz v. Shaughnessy, 2 Cir., 200 F.2d 288; Chao-Ling Wang v. Pilliod, 7 Cir., 285 F.2d 517).

■ There is no doubt from the record in this case that plaintiff was allowed a full and fair opportunity to put forward his evidence proving, or tending to prove, that he would be subject to physical persecution if sent to Yugoslavia. However, the evidence to the contrary, which was apparently considered by the Commissioner in his final determination, was submitted in a file which plaintiff was not even permitted to see. No opportunity was given plaintiff to explain, rebut, contradict or impeach the documents in question. No contention is made that the documents in the file were confidential because their disclosure would be harmful to the security or safety of the United States. Under these circumstances, this case does not come within the scope of the ruling in Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L. Ed. 1242.[2] No attempt has been made to show that the file upon which the Federal

---

2. I am constrained to here refer to the case of United States v. Coplon, 2 Cir., 185 F.2d 629, 28 A.L.R.2d 1041. This, of course, is a criminal case, but it stands for the principle that a citizen who opposes the Government in a proceeding has the right to know and meet the evidence against him. Miss Coplon's liberty was weighed against national security, and her liberty was held to be paramount. In this case, the Hearing Examiner has weighed Radic's life against nothing (so far as the record shows), and amazingly has found that the latter outweighs the former.

officials relied here in reaching their decision was kept outside the record under any circumstances which made such action reasonable. To the contrary it appears that defendant arbitrarily and capriciously drew a cloak of secrecy around such evidence as is claimed to be contrary to plaintiff's contentions. And this was done without offering any reason or rational explanation for the refusal to disclose the evidence which patently was the very basis for the denial of plaintiff's application. For all that appears in the record now before the Court this vital file could have been made up of clippings from magazines and newspapers of general circulation in the United States. The United States Supreme Court expressly pointed out that no such situation existed in Jay v. Boyd, supra (See: 351 U.S. 358, 76 S.Ct. 927). It was clearly shown in that case that certain particular information was kept confidential because its disclosure would have been prejudicial to the public interest, safety or security.

■ From the record before me in this case, it is patent that plaintiff has not been afforded procedural due process here. Under our form of Government, the right to a hearing embraces *not only the right to present evidence in support of one's position, but also a reasonable opportunity to know the claims of the opposing party with the privilege of seeking to refute those claims.* The right to be heard and the right to contest opposing evidence are equal and coexisting rights, and both are essential to procedural due process (Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129). The right to contest the opposing evidence was nullified in the instant case by the refusal to plaintiff of an opportunity to inspect the documents in the file which had been considered by the administrative agents. This right was, in my opinion, inviolate in the absence of a showing that the disclosure of those documents would be harmful to the security or well being of the United States of America (See: Boudin v. Dulles, 98 U.S.App.D.C. 305, 235 F.2d 532 and Dulles v. Nathan, 96 U.S.App.D.C. 190, 25 F.2d 29).

We have for a guide in this field the case of Parker v. Lester, 9 Cir., 227 F.2d 708. In that case the plaintiffs were six seamen, all American citizens. It appeared that if plaintiffs were erroneously granted the documents they sought, there would be a danger that in time of war the United States might suffer disastrous losses as a result of the intentional blowing up of munitions vessels in American harbors. Less spectacular sabotage of the Merchant Marine might also take place. On the other hand, it appears that if the documents were erroneously denied, the plaintiff seamen would be deprived of the opportunity to work in the particular calling of their choice without good reason. Judge Murphy, in the lower Court, (See: D.C., 112 F.Supp. 433) allowed the sources of certain information to be kept confidential, holding that otherwise practically all of the sources of information of the F.B.I. and other Federal security agencies would be dried up. His decision was reversed, and it was held that as a matter of procedural due process the plaintiff seamen were entitled to confrontation and cross-examination of confidential informants (Parker v. Lester, supra).

Let us compare the equities of this case with those of the seamen in Parker v. Lester, supra. As had already been noted, the seamen could be deprived of no right other than that of working in the calling of their choice. They would have been deprived of this right by reason of the fact that to allow them to inspect the sources of the Government's information might be detrimental to the welfare of our Nation. To deprive them of this right was held to be a denial of procedural due process. Here in the instant case, without giving any reason, adequate or otherwise, for keeping the file in question confidential, plaintiff is subjected to deportation to Yugoslavia where, for all the record shows, plaintiff will be killed or at best imprisoned or persecuted just because he adheres to the Roman Catholic

faith, believes in the capitalistic system, and loves the institutions of the Government of the United States of America. And all of this he must face simply because a Hearing Examiner of the Immigration and Naturalization Service has found, on evidence which is neither made available to the plaintiff nor the Court, that to permit the plaintiff to remain in the United States might, contrary to the immigration laws, swell our population by one. My sense of justice is shocked by the inequities to which the defendant wishes me to become a party. I cannot, and I will not, accede to the defendant's pleas.

If the evidence and witnesses against an American citizen who is in danger of losing his job must be disclosed to him in spite of the destructive effect of such disclosure upon the whole system of counter-espionage upon which this country's security and existence may depend, can the evidence and witnesses against an alien be kept from his knowledge for no disclosed reason, when his very life is at stake? Is the right to one's job better protected by procedural due process than the right to one's life? If not, then Parker v. Lester, supra, in conjunction with Cakmar v. Hoy, supra, can mean but one thing, and that is that plaintiff in the instant case was entitled to a reasonable opportunity to examine the documents in the file upon which the agency officers relied, and to meet them as best he could. This right must, of course, be qualified in the light of Jay v. Boyd, supra, so that documents would not have to be disclosed if such disclosure would be prejudicial to the public interest, safety or security.[3]

It Is, Therefore, Ordered that judgment herein be, and the same is, hereby rendered in favor of the plaintiff;

It Is Further Ordered that defendant herein be, and he is, restrained from de-

porting plaintiff until plaintiff's application for a stay of deportation has been decided after a hearing in accordance with the demands of procedural due process as set forth in this opinion;

And It Is Further Ordered that plaintiff herein prepare findings of fact, conclusions of law, a form of judgment, and all other documents necessary for the complete disposition of this case in accordance with the provisions of this Memorandum and Order. All such documents are to be submitted to defendant for approval or disapproval as to form, and then lodged with the Clerk of this Court pursuant to the applicable rules and statutes.

---

3. In preparing this opinion, I have examined numerous authorities touching on the subject. Among the more pertinent ones are Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129; Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L. Ed.2d 1012; and Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377.

These cases deal with the issue which I am here required to resolve. Admittedly, they do not resolve the issue in precise terms, but each of them reaches the same legal result that I have reached here. They certainly leave me fully satisfied that I have reached the correct result in this case.