AMERICAN–ARAB ANTI–DISCRIMINA-TION COMMITTEE; Arab American Democratic Federation; Association of American University Graduates; Irish National Caucus; Palestine Human Rights Campaign; League of United Latin American Citizens; Michael Bogopolsky; Darrel Meyers; Southern California Inter–Faith Task Force on Central America; Aiad Khaled Barakat; Khader Musa Hamide; Nuangugi Julie Mungai; Amjad Mustafa Obeid; Ayman Mustafa Obeid; Naim Nadim Sharif; Michael Ibrahim Shehadeh; Bashar Amer; American Association of University Professors; Fund for Free Expression; American Friends Service Committee, Plaintiffs–Appellants,

v.

Janet RENO, in her capacity as Attorney General of The United States of America, et al.; Ernest E. Gustafson, District Director; Immigration & Naturalization Service, Defendants–Appellees.

AMERICAN–ARAB ANTI–DISCRIMINA-TION COMMITTEE; Arab American Democratic Federation; Association of American University Graduates; Irish National Caucus, et al., Plaintiffs–Appellees,

v.

Janet RENO; Doris Meissner; Harold Ezell; C.M. McCullough, et al., Defendants–Appellants.

AMERICAN–ARAB ANTI–DISCRIMINA-TION COMMITTEE; Arab American Democratic Federation; Association of American University Graduates; Irish National Caucus; Aiad Barakat; Naim Sharif, et al., Plaintiffs–Appellees,

v.

Janet RENO; Doris Meissner; Harold Ezell; Gustavo De la Vina; Ernest E. Gustafson; Richard K. Rogers, District Director; Immigration & Naturalization Service, Defendants–Appellants.

Nos. 94–55405, 94–55444 and 95–55177.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1995.

Decided Nov. 8, 1995.

Marc Van Der Hout, National Lawyers Guild, San Francisco, California; Dan Stormer, Hadsell & Stormer, Pasadena, California; David Cole, Ctr. for Constitutional Rights, Georgetown University Law Center, argued, Washington, D.C.; Paul L. Hoffman, Mark D. Rosenbaum, Carol Sobel, A.C.L.U. Foundation of Southern California, Los Angeles, California; John Scanlan, Indiana University School of Law, Bloomington, Indiana, for plaintiffs-appellants in No. 94–55405.

Douglas Letter and Steven R. Valentine, United States Department of Justice, Washington, D.C.; Michael P. Linderman and Linda S. Wendtland, Office of Immigration Litigation, Washington, D.C.; Michael C. Johnson, Assistant United States Attorney, Los Angeles, California, for defendants-appellees in No. 94–55405.

Douglas Letter, United States Department of Justice, Washington, D.C.; Michael P. Linderman, Office of Immigration Litigation, Washington, D.C.; Michael C. Johnson, Assistant United States Attorney, Los Angeles, California, for defendants-appellants in No. 94–55444.

Paul L. Hoffman, Mark D. Rosenbaum, Carol Sobel, A.C.L.U. Foundation of Southern California, Los Angeles, California; Marc Van Der Hout, National Lawyers Guild, San Francisco, California; David Cole, Ctr. for Constitutional Rights, Georgetown University Law Center, argued, Washington, D.C., for plaintiffs-appellees in No. 94–55444.

Michael S. Raab and Douglas Letter, United States Department of Justice, Washing-

ton, D.C.; Michael C. Johnson, Assistant United States Attorney, Los Angeles, California; Michael P. Linderman, Office of Immigration Litigation, Washington, D.C., for defendants-appellants in No. 95–55177.

Paul L. Hoffman, Mark D. Rosenbaum, Carol Sobel, A.C.L.U. Foundation of Southern California, Los Angeles, California; Marc Van Der Hout, National Lawyers Guild, San Francisco, California; David Cole, Ctr. for Constitutional Rights, Georgetown University Law Center, argued, Washington, D.C., for plaintiffs-appellees in No. 95–55177.

Before D.W. NELSON, CANBY, Circuit Judges, and TANNER, District Judge [*].

D.W. NELSON, Circuit Judge:

This opinion decides three cases that have been consolidated on appeal. Two of the cases involve claims of selective enforcement [1] of immigration laws in violation of the aliens' First Amendment rights, arising from the initiation of deportation proceedings under various provisions of the Immigration and Nationality Act ("the INA"), codified as amended at 8 U.S.C. § 1101 *et seq.* (1994), against Aiad Khaled Barakat, Naim Nadim Sharif, Bashar Amer, Ayman Mustafa Obeid, Julie Nuangugi Mungai, and Amjad Mustafa Obeid (No. 94–55444, collectively referenced as "the Six"); and Khader Musa Hamide and Michael Ibrahim Shehadeh (No. 94–55405, collectively referenced as "Hamide and Shehadeh"). In No. 94–55444, the Attorney General and the Immigration and Naturalization Service appeal the grant of a preliminary injunction against further deportation proceedings for the Six. In No. 94–55405,

Hamide and Shehadeh appeal the district court's denial of a similar preliminary injunction based on lack of subject matter jurisdiction. In the third case, No. 95–55177, the INS appeals the district court's finding of a due process violation and its grant of a permanent injunction prohibiting the INS' use of undisclosed classified information against Barakat and Sharif in adjustment-of-status legalization proceedings pursuant to section 245a of the Immigration Reform and Control Act of 1986 ("the IRCA"), Pub.L. 99–603, 100 Stat. 3394 (Nov. 6, 1986), codified as amended at 8 U.S.C. § 1255a (1994). We have jurisdiction to review orders granting or denying a preliminary injunction under 28 U.S.C. § 1292(a)(1) (1988) and jurisdiction to review the district court's final order granting a permanent injunction under 28 U.S.C. § 1291 (1988). We affirm the grant of a preliminary injunction against the INS in the proceedings to deport the Six, we affirm the grant of a permanent injunction against the INS preventing the use of undisclosed classified information against Barakat and Sharif in their legalization proceeding, and we vacate the district court's decision that it lacked jurisdiction to consider the selective enforcement claim of Hamide and Shehadeh and remand for the district court to address that claim on the merits.

## FACTUAL AND PROCEDURAL BACKGROUND

After initiating deportation proceedings, the INS arrested the eight named aliens in this case in January 1987. They were detained for several weeks in maximum security prisons and then released pending the outcome of deportation proceedings. The INS charged all but Mungai under various provisions of the McCarran–Walter Act of 1952 ("the 1952 Act") [2] for membership in an

---

[*] The Honorable Jack E. Tanner, Senior District Judge for the Western District of Washington, sitting by designation.

[1]. A selective enforcement claim is the immigration equivalent of a criminal selective prosecution claim.

[2]. The provisions of the 1952 Act provided in relevant part for the deportation of

(D) Aliens ... who advocate the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with any organization that advocates the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship ...;

organization, the Popular Front for the Liberation of Palestine ("PFLP"), that allegedly advocates the doctrines of world communism. In addition, the Six were charged with non-ideological immigration violations under 8 U.S.C. § 1251(a)(2) (1988) (overstaying a visa). Amer was also charged under 8 U.S.C. § 1251(a)(9) (1988) (failing to maintain student status). Later, charges were added for both Ayman Obeid and Amjad Obeid for changing their nonimmigrant status by taking unauthorized employment. In February, 1987, Mungai was also charged under the McCarran–Walter Act, 8 U.S.C. § 1251(a)(6)(D), (G), and (H).

In April 1987, the individual plaintiffs and several organizations initiated an action for damages, a declaration that the provisions of the 1952 Act under which the eight were charged are unconstitutional facially and as applied, and injunctive relief against the investigation, arrest, and deportation of aliens pursuant to the challenged provisions. On April 23, 1987, just four days before the district court's hearing on a motion for a preliminary injunction, the INS dropped the 8 U.S.C. § 1251(a)(6) ideological charges against the Six, but it retained the non-ideological, technical violation charges. The INS also dropped the original charges against Hamide and Shehadeh; but on April 28, 1987, it brought new charges against them under 8 U.S.C. § 1251(a)(6)(F)(iii), alleging that they were deportable as members of an organization that advocates or teaches the unlawful destruction of property. Later, the INS added a charge under 8 U.S.C. § 1251(a)(6)(F)(ii), alleging that Hamide and Shehadeh were associated with a group that advocates the unlawful assaulting or killing of government officers.

In April and May of 1987, former FBI director William Webster testified to Congress that "[a]ll of them were arrested because they are alleged to be members of a world-wide Communist organization which under the McCarran Act makes them eligible for deportation ... in this particular case if these individuals had been United States citizens, there would not have been a basis for their arrest." *Hearings before the Senate Select Committee on Intelligence on the Nomination of William H. Webster, to be Director of Central Intelligence*, 100th Cong., 1st Sess. 94, 95 (April 8, 9, 30, 1987; May 1, 1987). Also, at a press conference after the original charges were dropped against the Six, INS Regional Counsel William Odencrantz indicated that the change in charges was for tactical purposes and that the INS intends to deport all eight plaintiffs because they are members of the PFLP.

The district court issued orders on May 21, 1987 and June 3, 1987 holding that it had no jurisdiction over the 1952 Act claims of Hamide and Shehadeh on ripeness grounds. Hamide and Shehadeh unsuccessfully sought review of the statute by mandamus. *Hamide v. United States District Court*, No. 87–7249 (9th Cir. Feb. 24, 1988). When they again sought review in the district court, it found that their facial and as-applied constitutional challenges to the statute were not justiciable. *American–Arab Anti–Discrimination Committee v. Meese*, 714 F.Supp. 1060, 1064. (C.D.Cal.1989), *aff'd in part, rev'd in part, American–Arab Anti–Discrimination Committee v. Thornburgh*, 970 F.2d 501, 511 (9th Cir.1991). Ruling on the claims of the Six, the district court found the challenged statutory provisions unconstitutionally overbroad. 714 F.Supp. at 1083–84. On review, the Ninth Circuit reversed the district

(F) Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches ... (ii) the duty, necessity, or propriety, of the unlawful assaulting or killing of any [government] officer or officers ...; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage; (G) Aliens who write or publish, ... or knowingly cause to be circulated, distributed, printed, published, or displayed, ... any written or printed matter, advocating or teaching [the doctrines and activities prohibited in sections F and D];

(H) Aliens who are members of or affiliated with any organization that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display any written or printed matter of the character described in paragraph (G) of this subdivision.
8 U.S.C. §§ 1251(a)(6)(D), (F), (G), (H) (1988).

court's holding on ripeness grounds. 970 F.2d at 510–12.

On April 5, 1991, after the repeal of the 1952 Act, the INS instituted new proceedings against permanent resident aliens Hamide and Shehadeh under the "terrorist activity" provision of the Immigration Act of 1990 ("the IMMACT"), Pub.L. No. 101–649, 104 Stat. 4978 (Nov. 29, 1990), codified as amended at 8 U.S.C. § 1251(a)(4)(B) (1994) (rendering deportable "[a]ny alien who has engaged, is engaged, or at any time after entry engages in terrorist activity (as defined in section 1182(a)))." [3] The status of the charges under the 1952 Act is not clear: the Government has asserted at different times that the prior charges and proceedings under that Act remain pending concurrent with the new proceedings, or that the new charges "amended" the basis of the deportation proceedings so that the "terrorist activity" charges are the only ones currently pending.

All eight aliens then filed suit in district court claiming that the INS had singled them out for selective enforcement of the immigration laws based on the impermissible motive of retaliation for constitutionally protected associational activity. On January 7, 1994, however, the district court granted summary judgment to the Government on Hamide's and Shehadeh's selective enforcement claim, finding that it lacked jurisdiction. At the same time, the district court granted a motion for further discovery and a preliminary injunction against further deportation proceedings in the case of the Six.

Meanwhile, in June of 1987, Barakat and Sharif applied for legalization under the IRCA. In 1991, they received Notices of Intent to Deny because the INS, using undisclosed classified information, considered them excludable under former 8 U.S.C. § 1182(a)(28)(F).[4] Barakat and Sharif filed suit in district court challenging the use of classified information on several grounds, including a due process claim. The district court found that it had jurisdiction, and it issued a preliminary injunction against the confidential use of classified information. Following an *in camera, ex parte* examination of materials provided by the INS, the court concluded that use of the undisclosed information against Barakat and Sharif would constitute a due process violation, and it granted a permanent injunction against its use on January 24, 1995.

## DISCUSSION

### I. JURISDICTION

■ As a threshold matter, we must determine whether the district court had jurisdiction to adjudicate these challenges to the INS' discretionary decisions and procedures. We review de novo the district court's decision regarding its subject matter jurisdiction. *Naranjo–Aguilera v. INS,* 30 F.3d 1106, 1109 (9th Cir.1994).

### A. SELECTIVE ENFORCEMENT CLAIMS

"To succeed on a selective prosecution claim, the defendant bears the burden of showing both 'that others similarly situated have not been prosecuted and that the prosecution is based on an impermissible motive.'" *United States v. Bourgeois,* 964 F.2d 935, 938 (9th Cir.) (quoting *United States v. Wayte,* 710 F.2d 1385, 1387 (9th Cir.1983), *aff'd,* 470 U.S. 598 (1985)), *cert. denied,* 506 U.S. 901, 113 S.Ct. 290, 121 L.Ed.2d 215 (1992).

---

3. The IMMACT defines "engage in terrorist activity" as:

> to commit, in an individual capacity or as a member of an organization, an act of terrorist activity or an act which the actor knows, or reasonably should know, affords material support to any individual, organization, or government in conducting a terrorist activity at any time.

8 U.S.C. § 1182(a)(3)(B)(iii) (1994).

4. The former provision excluded:

> Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches ... (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any other organized government, because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property.

8 U.S.C. § 1182(a)(28)(F).

### 1. The Six Nonimmigrant Aliens

The Government argues that the district court lacked jurisdiction because the aliens' claim of selective enforcement can be reviewed directly by the court of appeals only upon review of a final order of deportation. We disagree.

### a. The Statutory Scheme for Judicial Review

■ Section 106 of the INA, as amended, provides exclusive judicial review in the courts of appeals for "all final orders of deportation" after exhaustion of "administrative remedies available to [the petitioner] as of right." 8 U.S.C. §§ 1105a(a), (c) (1994).[5] Discretionary "determinations made during an incident to the administrative proceeding ... and reviewable together by the Board of Immigration Appeals ... are likewise included within the ambit of the exclusive jurisdiction of the Courts of Appeals under § 106(a)." *Foti v. INS,* 375 U.S. 217, 229, 84 S.Ct. 306, 313–14, 11 L.Ed.2d 281 (1963). However, because of the need for a factual record beyond that which can be developed in the agency proceeding, we ordinarily cannot review many discretionary decisions of the INS as part of our review of a final deportation order. *See, e.g., Abedi–Tajrishi v. INS,* 752 F.2d 441, 443 (9th Cir.1985) (finding no jurisdiction to review a discretionary decision when factual development is necessary); *Mohammadi–Motlagh v. INS,* 727 F.2d 1450, 1451, 1452 (9th Cir.1984) (finding no jurisdiction for appellate review when the immigration judge and the Board of Immigration Appeals lack jurisdiction to review a district director's discretionary deci-

sion). When the provision for exclusive review in the courts of appeals is inapplicable, jurisdiction lies in the district court pursuant to the federal question statute, 28 U.S.C. § 1331, and pursuant to the general grant of power to review matters arising under the immigration laws, 8 U.S.C. § 1329. *See Cheng Fan Kwok v. INS,* 392 U.S. 206, 210, 88 S.Ct. 1970, 1973, 20 L.Ed.2d 1037 (1968); *Karmali v. INS,* 707 F.2d 408, 409 (9th Cir. 1983).

■ The decision to institute deportation proceedings, the basis for a selective enforcement claim, is a discretionary decision of the INS director that is not subject to review by either the immigration judge ("IJ") or the Board of Immigration Appeals ("BIA"). *See Lopez–Telles v. INS,* 564 F.2d 1302, 1304 (9th Cir.1977). Both the IJ conducting the deportation proceeding and the Government agree that neither the IJ nor the BIA has jurisdiction to consider a selective enforcement claim during a deportation proceeding. Thus, we conclude that selective enforcement claims are not subject to the statutory provision for exclusive review after issuance of a final deportation order.

■ The Government's argument that the selective enforcement claim in this case is "purely legal" and thus reviewable only in the court of appeals is unpersuasive. Both prongs of the selective enforcement claim— disparate impact and discriminatory intent— require factual proof. *See United States v. Armstrong,* 48 F.3d 1508, 1513 (9th Cir.1995) (en banc), *cert. granted,* —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995). The district court ordered discovery and reviewed

---

**5.** The section provides, in relevant part:

(a) Exclusiveness of procedure[:] The procedure prescribed by, and all the provisions of chapter 158 of Title 28 [the Hobbs Act,] shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation, heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title, or comparable provisions of any prior Act, *except* that ... (4) except as provided in clause (B) of paragraph (5) of this subsection, the petition shall be determined solely upon the administrative record upon which the deportation order is based ... [and] (5) whenever any petitioner, who

seeks review of an order under this section, claims to be a national of the United States ... the court shall ... (B) where a genuine issue of material fact as to the petitioner's nationality is presented, transfer the proceedings to a United States district court ... for hearing de novo of the nationality claim....

(c) An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order....

8 U.S.C. §§ 1105a(a), (c) (1994) (emphasis added).

evidence from the aliens and from the Government that would not be available in a deportation proceeding. The aliens have submitted to the district court more than 450 pages of declarations, exhibits, and transcripts in support of their claims. In the course of factual development, for example, the INS has conceded that Amer is the only alien that the Los Angeles INS office has sought to deport for taking too few credits as a student, even though many such students have been reported to the INS. We therefore find that the district court had jurisdiction to consider these selective enforcement claims.

### b. The Government's Counterarguments

The Government offers three additional arguments to defeat district court jurisdiction. First, it suggests that a selective enforcement claim in the immigration context is inappropriate, because the decision to enforce the immigration laws is a non-justiciable political question involving foreign policy decisions that are immune from judicial review. Second, the Government claims that if such claims are viable, the statutory scheme provides alternative mechanisms for review in the agency or the appellate courts. Third, the Government argues that even though discretionary claims fall outside the statutory provision for exclusive review and exhaustion, we should decline jurisdiction to consider these claims on prudential ripeness grounds. We consider each of these arguments in turn.

### (1) Political Question

The Government contends that the courts cannot consider an alien's selective enforcement claim because the Government's discretionary decision implicates foreign policy concerns that are non-justiciable political questions. *See, e.g., Baker v. Carr*, 369 U.S. 186, 208–213, 82 S.Ct. 691, 705–708, 7 L.Ed.2d 663 (1962) (discussing foreign policy issues as a basis for the political question doctrine).

There is, however, clear precedent for judicial recognition of selective enforcement claims. Although alienage classifications are closely connected to matters of foreign policy and national security, *see, e.g.,*

*Plyler v. Doe*, 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2395 n. 19, 72 L.Ed.2d 786 (1982); *Fiallo v. Bell*, 430 U.S. 787, 796, 97 S.Ct. 1473, 1480, 52 L.Ed.2d 50 (1977), "the judicial branch may examine whether the political branches have used a foreign policy crisis as an excuse for treating aliens arbitrarily," *Shahla v. INS*, 749 F.2d 561, 563 n. 2 (9th Cir.1984); *see also Yassini v. Crosland*, 618 F.2d 1356, 1360 (9th Cir.1980) (noting that "serious questions might arise" if the INS disregarded constitutional protections). "[T]he presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine." *INS v. Chadha*, 462 U.S. 919, 942–43, 103 S.Ct. 2764, 2779–80, 77 L.Ed.2d 317 (1983). Thus, we can and do review foreign policy arguments that are offered to justify legislative or executive action when constitutional rights are at stake. *Id.* Contrary to the Government's suggestion, the foreign policy powers which permit the political branches great discretion to determine which aliens to exclude from entering this country do not authorize those political branches to subject aliens who reside here to a fundamentally different First Amendment associational right. *See, e.g., Landon v. Plasencia*, 459 U.S. 21, 25–26, 103 S.Ct. 321, 325–326, 74 L.Ed.2d 21 (1982) (explaining the difference between exclusion of an alien upon initial entry and deportation of aliens who have been in the country); *see also* Charles D. Weisselberg, *The Exclusion and Detention of Aliens: Lessons From the Lives of Ellen Knauff and Ignatz Mezei*, 143 U.Pa.L.Rev. 933, 939–47 (noting that the power of exclusion stems from the sovereign power of the federal government over its territory). If we were to decline jurisdiction on this basis, we would, in essence, proclaim that the courts have no essential function in ensuring that aliens are not targeted by the INS in retaliation for exercising their acknowledged constitutional rights, and we would allow those rights to be forfeited without redress. Clearly, the foreign policy powers of the political branches do not extend that far.

### (2) Alternative Mechanisms for Review

We also reject the Government's assertion that the Hobbs Act provisions pro-

vide a mechanism by which the courts of appeals may assume jurisdiction over factual issues for which a record cannot be developed in regular INS proceedings. *See* 28 U.S.C. § 2347(c) (allowing remand to the agency for factual development); 28 U.S.C. § 2347(b)(3) (allowing transfer to a district court for a de novo trial on an ancillary matter). First, the remand provision is not applicable in this instance. *See, e.g., Ramirez–Gonzalez v. INS,* 695 F.2d 1208, 1213 (9th Cir.1983) (finding that § 2347(c) is inapplicable to INS proceedings, because the regulations provide a means to petition to the BIA to reopen the proceedings, in its stead); *Ghorbani v. I.N.S.,* 686 F.2d 784, 787 n. 4 (9th Cir.1982) (finding that § 1105a(4), which requires judicial review of the administrative record, precludes application of the Hobbs Act provision for remand on matters for which the agency lacks jurisdictional authority).

■ Second, because § 1105a allows transfer to a district court exclusively for de novo review of citizenship claims, the general transfer provision available elsewhere under the Hobbs Act does not apply in the immigration context. *Compare* 8 U.S.C. §§ 1105a(a)(5), (7) *with* 28 U.S.C. § 2347(b)(3). Even those circuits that disagree with this circuit's interpretation that remand under § 2347(c) is not available have declined to apply § 2347(b)(3) to authorize a transfer under § 1105a to a district court for claims not addressable before the IJ and BIA. *See, e.g., Coriolan v. INS,* 559 F.2d 993, 1003 (5th Cir.1977).

The Government mistakenly relies on *Public Util. Comm'r of Oregon v. Bonneville Power Admin.,* 767 F.2d 622 (9th Cir.1985), which held that the courts of appeals have exclusive jurisdiction of actions challenging the constitutionality of administrative proceedings under an act regulating utility rates. *Id.* at 624–25. That case involved a question of the breadth of the statutorily mandated jurisdiction, where the wording of the statute was much broader than the INS statute in the present case. *See id.* at 625–26. The statutory jurisdictional mandate in § 1105a is narrower and, in appropriate instances, permits equitable relief in the dis-

trict court for constitutional and procedural challenges. *See McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 484, 494, 111 S.Ct. 888, 892, 897, 112 L.Ed.2d 1005 (1991) (interpreting § 1105a in the IRCA context to find district court jurisdiction to hear constitutional and statutory challenges to INS procedures when meaningful judicial review of the statutory and constitutional claims otherwise would be foreclosed).

### (3) Ripeness

■ The Government also argues that this court should find that the district court lacked jurisdiction to hear these selective enforcement claims because of prudential ripeness concerns that are relevant to its jurisdiction to grant equitable relief. In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court established a two-pronged framework for ripeness analysis in the administrative agency context: courts should consider the fitness of the issues for judicial review and the hardship to the parties involved. *Id.* at 148–49, 87 S.Ct. at 1515–16. The "core principle" is that statutory requirements should not be construed to cause "irreparable injuries to be suffered" or the loss of "crucial collateral claims." *Mathews v. Eldridge,* 424 U.S. 319, 331 n. 11, 96 S.Ct. 893, 900–01 n. 11, 47 L.Ed.2d 18 (1976). We therefore agree with the Six that their claim is ripe for review, because (1) the chill to their First Amendment rights is an irreparable injury that cannot be vindicated by post-deprivation review and (2) exhaustion through the deportation proceeding would be futile, in that the IJ and BIA cannot consider and develop facts about INS' enforcement policies, practices, or motives, which are not subject to change through further agency interpretation.

### (a) Hardship

■ The Supreme Court's overbreadth doctrine rests on the proposition that an overbroad statute has a chilling effect on First Amendment rights that cannot be vindicated through the normal channels of defense to a prosecution: that is, the legal and practical value of the First Amendment right

may be destroyed if not vindicated before trial. *See Dombrowski v. Pfister,* 380 U.S. 479, 486–89, 85 S.Ct. 1116, 1120–22, 14 L.Ed.2d 22 (1965). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Courts thus grant extraordinary relief because "[j]oining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection" so that "the duration of a trial is an 'intolerably long' period during which to permit the continuing impairment of First Amendment rights." *In re Asbestos School Litigation (Pfizer Inc. v. The Honorable James T. Giles),* 46 F.3d 1284, 1294 (3d Cir.1994). Even in the context of state criminal prosecutions, where federalism concerns raise additional barriers to the federal courts' exercise of equitable jurisdiction, federal courts refuse to abstain in cases involving a bad faith prosecution that has little expectation of a valid conviction or is initiated to retaliate for or discourage the exercise of constitutional rights. *See, e.g., Lewellen v. Raff,* 843 F.2d 1103, 1109 (8th Cir.1988) (finding that the district court need not abstain when state prosecutors brought charges against an African American attorney in retaliation for his exercise of constitutional rights), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989). We find that the perpetual threat of deportation based on group affiliation constitutes the kind of irreparable injury that is relevant to the ripeness inquiry here.

*(b) Fitness*

 We also agree with the Six that exhaustion would be a futile exercise because the agency does not have jurisdiction to review a selective enforcement claim. *Lopez–Telles,* 564 F.2d at 1304. "If the agency lacks authority to resolve the constitutional claims, there is little point to requiring exhaustion." *Xiao v. Barr,* 979 F.2d 151, 154 (9th Cir.1992). Furthermore, we customarily decline to apply the prudential ripeness doctrine when exhaustion would be a futile attempt to challenge a fixed agency position.

*See, e.g., El Rescate Legal Serv. v. Executive Office of Immigration Review,* 959 F.2d 742, 747 (9th Cir.1991). Other circuits have similarly found exhaustion futile unless "there is genuine doubt as to what is going to happen in the administrative process." *Rafeedie v. I.N.S.,* 880 F.2d 506, 514 (D.C.Cir.1989).

Contrary to the Government's assertion, our earlier opinion in this case is not dispositive here. *See American–Arab Anti–Discrimination Committee,* 970 F.2d at 510–12. We held that prudential concerns weighed against the district court's assuming jurisdiction of the unconstitutional-as-applied challenge to the 1952 Act, because the factual record developed in the agency proceeding to support the application of the statute would assist our review of that claim. *Id.* at 510–511. In contrast, this case does not involve a facial or as-applied challenge to a statute. These selective enforcement claims are not moot now, and the speculative possibility that they may be rendered moot in the future is not sufficient to require futile exhaustion of administrative remedies. Therefore, we hold that the district court properly exercised jurisdiction over the nonimmigrant aliens' selective enforcement claims.

*2. The Permanent Resident Aliens, Hamide and Shehadeh*

The two permanent resident aliens, Hamide and Shehadeh, also contend that the district court had jurisdiction to consider their selective enforcement claims. Unlike the Six, Hamide and Shehadeh have been charged solely under provisions, in both the 1952 Act and the IMMACT, that are based on affiliation with disfavored political organizations. Because the posture in which their claims are presented is different from that of the claims of the Six, we consider them separately.

 The basis for jurisdiction over Hamide's and Shehadeh's claims is essentially the same as that found to support district court jurisdiction for the Six. The exclusive mechanism for judicial review of a final deportation order does not provide a means of review of a selective enforcement claim for which the IJ and BIA lack adjudicatory au-

thority. See the discussion in Part I.A.1.a. *supra.* Although the Government asserts that no factual development is necessary beyond that which the Government will provide in the deportation proceeding as part of its case under the IMMACT, the agency proceeding cannot develop a factual record regarding patterns and practices of the INS treatment of aliens who may be similarly situated supporters of lawful activities of alleged terrorist organizations. *Id.* Thus, the legal arguments in Part I.A.1.a. apply as well to Hamide and Shehadeh: their selective enforcement claims can be considered only in the district court.

The Government argues—and the district court ultimately agreed—that the ripeness concerns relevant to these claims are different because the motive for targeting Hamide and Shehadeh cannot be considered truly pretextual, in that both the 1952 Act and the IMMACT provisions under which they are currently charged treat some aspect of affiliation as a basis for deportation. The Government essentially argues that the legal issue addressed in the deportation proceeding—how the IMMACT's terrorist activity provisions should be interpreted and whether the aliens' actions satisfy those requirements—is the same issue that must be addressed, under the second prong of the selective enforcement claim, to determine whether the Government unconstitutionally has singled out these aliens on the basis of an impermissible motive of retaliation for exercise of their First Amendment rights.

We conclude that the claim that Hamide and Shehadeh assert here is broader than that which they may raise in a defense of deportation. The legal issue that the IJ and the BIA will address is whether the aliens' actions satisfy the requirements of the IMMACT's terrorist activity provisions; however, the issue underlying the selective enforcement claim of impermissible motive is whether the support of lawful activities of a disfavored organization that may also engage in unlawful terrorist activities provides a constitutional basis for deportation of a permanent resident alien. The selective enforcement claim necessarily imposes a different focus and requires the court to consider patterns of INS prosecutions rather than a particular application of a statute. *Montes v. Thornburgh,* 919 F.2d 531, 535 (9th Cir.1990) (finding § 1105a inapplicable to suits alleging a pattern and practice of constitutional violations).

We hold, therefore, that the district court erred in declining jurisdiction on ripeness grounds, and we remand for further proceedings in accord with this decision.

## B. CLASSIFIED INFORMATION CLAIM

In 1986, Congress amended the immigration laws to allow legalization of undocumented aliens who had entered the country before January 1, 1982. IRCA, Pub.L. 99-603 § 201(a), 100 Stat. 3394 (Nov. 6, 1985), as amended and codified in 8 U.S.C. § 1255a (amending the Immigration and Nationality Act by adding section 245a regulating adjustment of status). The act established exclusive jurisdiction in the courts of appeals for judicial review of denials of legalization on review of final orders of deportation. 8 U.S.C. § 1255a(f)(4).[6]

### 1. *The Statutory Grant of Exclusive Jurisdiction*

The Government argues that Barakat and Sharif are challenging an individual determination in a legalization proceeding, and thus must exhaust their administrative remedies by undergoing the deportation proceeding before they are entitled to judicial review of their claim that use of undisclosed classified information to evaluate adjustment-of-status applications violates due process. Because the agency proceeding will not address the due process claim, however, the statutory exhaustion provision does not re-

---

**6.** The judicial review provision states, in relevant part:

(A) Limitation to review of deportation[:] There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title.

(B) Standard for judicial review[:] Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority. 8 U.S.C. § 1255a(f)(4).

quire the aliens to present their challenge to this INS practice through the exclusive review mechanism for final orders of deportation. *See McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 483–84, 111 S.Ct. 888, 891–92, 112 L.Ed.2d 1005 (1991) ("*HRC*") (permitting district court consideration of claims that the INS engaged in unconstitutional procedural practices relating to acceptance of legalization applications). Barakat's and Sharif's due process claim is not unlike the due process violations that the Court found justiciable in *HRC*, which included routine, arbitrary denial of applications that were not supported by payroll records, maintenance of a secret list of employers whose supporting affidavits were routinely discredited, failure to provide interpreters at interviews, and failure to record or transcribe interviews. *See id.* at 489 n. 9, 111 S.Ct. at 894 n. 9. Such due process violations concern the implementation of practices to carry out the legalization program, rather than an "individual [eligibility] determination." *See id.* at 498, 111 S.Ct. at 899. "Nor would the fact that they prevail on the merits of their purportedly procedural objections have the effect of establishing their entitlement to [adjustment of] status." *Id.* at 495, 111 S.Ct. at 897. Thus, the aliens are not challenging the particular outcome of the application, but the collateral procedure of using undisclosed classified information that the INS deems generally available in processing legalization applications. *See id.* at 492, 111 S.Ct. at 896; *Campos v. Nail*, 940 F.2d 495, 497 (9th Cir. 1991) (finding jurisdiction when the plaintiffs "do not seek the determination of the merits of any individual deportation order, but challenge a judge's blanket policy on constitutional grounds"). Therefore, we conclude that the statutory grant of exclusive appellate jurisdiction for review of deportation orders does not preclude district court jurisdiction over these due process claims.

### 2. Prudential Ripeness Concerns

▇ The Government also contends that prudential ripeness concerns mandate a denial of district court jurisdiction. Soon after the *HRC* decision, the Supreme Court addressed the relationship between the statutory exclusive review provision for INS depor-

tation orders and the prudential ripeness concerns in the IRCA adjustment-of-status context. *See Reno v. Catholic Social Services*, —— U.S. ——, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) ("*CSS*") (considering the INS practice of rejecting without consideration any agricultural worker legalization applications from aliens whom INS employees deemed a priori ineligible under the statute). The *CSS* Court acknowledged that prudential ripeness concerns usually preclude jurisdiction "unless the effects of the administrative action challenged have been 'felt in a concrete way by the challenging parties.'" *Id.* at ——, 113 S.Ct. at 2495 (quoting *Abbott Labs.*, 387 U.S. at 148–49, 87 S.Ct. at 1515–16). Although "[i]n some cases the promulgation of a regulation will itself affect parties concretely enough to satisfy this requirement," *id.* at ——, 113 S.Ct. at 2495, the prudential doctrine and the statutory exclusive grant of jurisdiction "ordinarily" "dovetail" so that the claim ripens only at the point that the exclusive review provision applies, thus delaying review of constitutional challenges until the appellate review of a final deportation order. *Id.* at ——, 113 S.Ct. at 2497.

The Government argues that *CSS* bars any pre-enforcement review because legalization is a benefit whose denial does not place the applicant in the dilemma of paying a cost to comply or paying a penalty for noncompliance. *See CSS*, —— U.S. at —— – ——, 113 S.Ct. at 2495–96 (noting that the challenged regulations adopted to develop the criteria for temporary resident status merely limited access to a benefit not automatically bestowed on eligible aliens); *Abbott Labs.*, 387 U.S. at 152–53, 87 S.Ct. at 1517–18 (discussing the compliance dilemma as one factor in determining ripeness). While we acknowledge that a positive outcome of the legalization process is a benefit for the alien, we disagree that this factor is determinative in the ripeness analysis of this due process claim, which challenges a collateral procedure limiting access to an entitlement. *See, e.g., Atlantic Richfield Co. v. United States Dep't of Energy*, 769 F.2d 771, 782–83 (D.C.Cir.1984) (noting that ripeness concerns balance all aspects of hardship to the parties against the extent to which strict adherence

to ripeness requirements will ensure that issues are better fit for judicial review).

*a. Fitness: Concrete Effect and Adequacy of Agency Record*

█ The Supreme Court recognized that an agency action may result in immediate adverse consequences or pose a realistic threat of such harm. *CSS,* — U.S. at ——, 113 S.Ct. at 2495. Challenges to the promulgation of a regulation, as in *CSS,* raise ripeness concerns that the courts will become involved in "abstract disagreements over administrative policies." *Abbott Labs.,* 387 U.S. at 148, 87 S.Ct. at 1515. Here, however, the INS' determination to adjudicate nondiscretionary statutory entitlements on the basis of undisclosed information represents a concrete controversy: by applying for legalization, each alien has already taken whatever "affirmative steps … he could take before the INS blocked his path." *CSS,* — U.S. at ——, 113 S.Ct. at 2496.

█ Furthermore, agency actions that "pre-determine" the future action of the agency generate a sufficiently concrete effect to be cognizable by the courts. *See, e.g., Portland Audubon Society v. Babbitt,* 998 F.2d 705, 707 (9th Cir.1993) (reviewing the Secretary of Interior's decision not to supplement an environmental impact statement with new information relating to the effects of logging on the northern spotted owl). In *Portland Audubon,* we held that the decision was ripe for review prior to the initiation of individual sales "because, to the extent these [agency actions] pre-determine the future, the Secretary's failure to comply with [the] NEPA [statute] represents a concrete injury which would undermine any future challenges by plaintiffs." *Id.* at 708. The Notices of Intent to Deny similarly "pre-determined the future" and concretely affected Barakat and Sharif by subjecting them to a legalization determination based on secret information.

█ Moreover, these claims are ripe because the factfinding necessary for determination of the claim can only occur at the district court. *See, e.g., CSS,* — U.S. at —— – ——, 113 S.Ct. at 2499–2500 (recognizing the importance of an administrative rec-

ord that would permit review on appeal from a deportation order); *Tooloee v. INS,* 722 F.2d 1434, 1437–38 (9th Cir.1983) (same). In the present case, the district court appropriately applied the *Mathews* balancing test, in order to determine whether the administrative procedure satisfies due process. Under the test, the court must weigh:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). After ordering discovery, the district court granted the permanent injunction based on factual development in the following areas:

1) the importance to the plaintiffs of their immigration applications, 2) the risk that the plaintiffs will be erroneously deprived of temporary resident or other legalized status, 3) the likelihood that allowing access to the classified information would reduce the risk of an erroneous deprivation, and 4) the Government's interest in keeping certain information confidential because of national security concerns, together with the Government's interest in denying legalization to people who are members of groups such as the PFLP.

█ Because these issues do not come within the scope of the IRCA review process, the legalization and deportation proceedings cannot generate a record for review. *See HRC,* 498 U.S. at 493, 111 S.Ct. at 896 (noting that the administrative review process would not generate an adequate record for review of due process claims such as lack of translators). No facts relevant to the due process determination can be adduced at the agency hearing because that hearing proceeds under the premise that use of undisclosed information against the alien is legal. *See, e.g., Rafeedie,* 880 F.2d at 516–17 (stat-

ing that "any 'factual record' that [a hearing] would generate is unlikely to be more than a catalogue of the Government's untested allegations and [the alien's] not directly responsive denials").

### b. Hardship: First Amendment Chill and Right to Work

■ As noted earlier, injury to First Amendment rights more readily justifies a finding of ripeness "due to the chilling effect on protected expression which delay might produce." *Planned Parenthood v. Kempiners,* 700 F.2d 1115, 1122 (7th Cir.1983) (Cudahy, J. concurring) (noting that the statute in question forced a choice between exercising First Amendment rights to speak on the abortion issue and risking loss of eligibility for state benefits). Since the Government has targeted these aliens because of their association with the PFLP, the Notices of Intent to Deny had a palpable chilling effect. *See, e.g., City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–57, 108 S.Ct. 2138, 2142–44, 100 L.Ed.2d 771 (1988) (permitting a challenge to a licensing statute because it immediately "intimidates parties into censoring their own speech"); *Ripplinger v. Collins,* 868 F.2d 1043, 1047 (9th Cir. 1989) (permitting a preenforcement challenge to a statute because of its immediate "chilling effect on protected speech"). We agree with the D.C. Circuit that irreparable injury to First Amendment rights results from the use of secret information about presumptively protected affiliations in INS proceedings, since an alien denied legalization faces loss of his right to work and to support his family, *see HRC,* 498 U.S. at 490–91, 111 S.Ct. at 895, not because of his "illegitimate activities, but [because of] his legitimate activities as an outspoken critic of the Government's foreign policy." *Rafeedie,* 880 F.2d at 517. When weighed against the minimal benefit to judicial or administrative interests from further administrative proceedings, these injuries tip the scales against requiring exhaustion. *Id.* at 518.

■ We hold that the district court appropriately exercised jurisdiction over Barakat's and Sharif's claim that use of undisclosed classified information in the legaliza-

tion process violates due process requirements because it is a collateral, procedural challenge to an INS practice that requires factfinding beyond the purview of the agency proceedings and does not challenge the INS' individual determination of a substantive eligibility criteria. *See id.* Therefore, it falls under the *HRC* rule in accord with our *Naranjo* decision that district courts have jurisdiction when the "limited review scheme would be incapable of generating an administrative record adequate for effective judicial review." *Naranjo–Aguilera,* 30 F.3d at 1113.

## II. MERITS

### A. THE PRELIMINARY INJUNCTION AGAINST SELECTIVE ENFORCEMENT

#### 1. Standard of Review

■ We review a district court's issuance of a preliminary injunction for abuse of discretion, which occurs if the court bases its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Miller v. California Pacific Medical Center,* 19 F.3d 449, 455 (9th Cir.1994) (en banc). A preliminary injunction is warranted where plaintiffs show "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in [their] favor." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.,* 886 F.2d 1173, 1174 (9th Cir.1989).

#### 2. Selective Enforcement Justifies a Preliminary Injunction

■ The district court determined that the Six were likely to succeed on their selective enforcement claims. We reiterate here the prima facie elements of the claim: (1) "others similarly situated have not been prosecuted" (disparate impact) and (2) "the prosecution is based on an impermissible motive" (discriminatory motive). *United States v. Aguilar,* 883 F.2d 662, 705 (9th Cir.1989) (quoting *United States v. Lee,* 786 F.2d 951, 957 (9th Cir.1986)), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991); *see also Wayte v. United States,* 470 U.S.

598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985).

### a. Control Group and Evaluation of Evidence

■■■ Crucial to the analysis is the establishment of the appropriate control group—a group that is similarly situated in all respects to those who claim selective enforcement, except for the attribute on which the selective enforcement claim rests. *Aguilar*, 883 F.2d at 706–07; *United States v. Steele*, 461 F.2d 1148, 1150 (9th Cir.1972) (finding an inference of discrimination where the defendant, who was a vocal advocate of non-compliance with census laws, was prosecuted while six others, who were not vocal though equally against compliance, were not prosecuted).

The district court selected as a control group those aliens who have either violated non-ideological provisions or are associated with terrorist organizations whose views the government tolerates. The factor thus isolated is association with governmentally disfavored political views, the ground on which the six aliens claim they are being prosecuted. The court found that the government's proffered evidence of prosecution of similarly situated individuals was insufficient to defeat the disparate impact claim, because the cases involved individuals who had actually committed terrorist acts, rather than persons who merely associated with terrorist organizations. The court's conclusion that the aliens presented prima facie evidence of disparate impact is not clearly erroneous.

### b. First Amendment Guarantees in the Deportation Context

The court also found that the statements of Webster and Odencrantz, which reveal that the aliens have been targeted because of their membership in terrorist organizations, established the prima facie element of impermissible motive, because the Government acknowledges that United States citizens cannot be arrested for the same behavior. Thus, the gravamen of this case is the legal question whether aliens may be deported because of their associational activities with particular disfavored groups, or whether aliens who reside within the jurisdiction of the United States are entitled to the full panoply of First Amendment rights of expression and association. "We review de novo issues of law underlying the district court's preliminary injunction." *Miller*, 19 F.3d at 455.

### (1) First Amendment Standards Protect Associational Activities

The Government does not dispute that the First Amendment protects a citizen's right to associate with a political organization; even if that association includes ties with groups that advocate illegal conduct or engage in illegal acts, the power of the Government to penalize association is narrowly circumscribed. "[T]he right of association is a 'basic constitutional freedom' ... [that] lies at the foundation of a free society." *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976) (citations omitted). Government cannot "deny[ ] rights and privileges solely because of a citizen's association with an unpopular organization." *Healy v. James*, 408 U.S. 169, 185–86, 92 S.Ct. 2338, 2348, 33 L.Ed.2d 266 (1972).

■■■ Under the standard enunciated by the Supreme Court in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), advocacy may be punished only if it is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. at 1829. The Government must establish a "knowing affiliation" and a "specific intent to further those illegal aims." *Healy*, 408 U.S. at 186, 92 S.Ct. at 2348. "Guilt by association alone" violates the First Amendment. *Robel*, 389 U.S. at 265–66, 88 S.Ct. at 424–25.

Here, the Government has not attempted to show that the aliens' association with the PFLP satisfies the currently applicable *Brandenburg* standard; instead, it argues that aliens are not entitled to the same First Amendment protections that citizens enjoy.

### (2) Aliens in the United States Enjoy Full First Amendment Rights

■■■ The Supreme Court has consistently distinguished between aliens in the United

States and those seeking to enter from outside the country, and has accorded to aliens living in the United States those protections of the Bill of Rights that are not, by the text of the Constitution, restricted to citizens. *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953). Accordingly, the Court has explicitly stated that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon,* 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945); *see also United States v. Verdugo–Urquidez,* 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990); *Kwong Hai Chew,* 344 U.S. at 596–97 n. 5, 73 S.Ct. at 477–78 n. 5. "None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority." *Bridges,* 326 U.S. at 161, 65 S.Ct. at 1455 (Murphy, J., concurring), *quoted in Kwong Hai Chew,* 344 U.S. at 596–97 n. 5, 73 S.Ct. at 477–78 n. 5.

Furthermore, the values underlying the First Amendment require the full applicability of First Amendment rights to the deportation setting. Thus, "read properly, *Harisiades* establishes that deportation grounds are to be judged by the same standard applied to other burdens on First Amendment rights." T. Alexander Aleinikoff, *Federal Regulation of Aliens and the Constitution,* 83 Am.J.Int'l L. 862, 869 (1989).

Because we are a nation founded by immigrants, this underlying principle is especially relevant to our attitude toward current immigrants who are a part of our community. *See, e.g., Verdugo–Urquidez,* 494 U.S. at 265, 110 S.Ct. at 1060 (recognizing that aliens with substantial ties through family and work form part of our "national community"). Aliens, who often have different cultures and languages, have been subjected to intolerant and harassing conduct in our past, particularly in times of crises. *See, e.g.,* Alien Enemies Act of 1798, Act of June 25, 1798, ch. 58, 1 Stat. 570, 571 (authorizing the President to expel "all such *aliens* as he shall judge dangerous to the peace and safety of the United States"); John Higham, *Strangers in the Land: Patterns of American Nativism 1860–1925,* 229–31 (2d ed. 1963) (describing the Palmer Raids of 1919–20). It is thus especially appropriate that the First Amendment principle of tolerance for different voices restrain our decisions to expel a participant in that community from our midst. *See Bridges,* 326 U.S. at 149, 65 S.Ct. at 1450 ("[W]here the fate of a human being is at stake the presence of the evil purpose may not be left to conjecture.").

*(3) The Government's Arguments Are Inapplicable to Deportation*

*(a) Deportation Differs Significantly From Exclusion*

The Government's reliance on *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), is misplaced. Nor do we find dispositive our earlier decision to apply the *Kleindienst* standard to review the Attorney General's decision to require listing of all organizations of which an applicant for naturalization is a member: we noted that "aliens at naturalization are not necessarily entitled to the full protection of the First Amendment arguably afforded in deportation hearings." *Price,* 962 F.2d at 843 n. 7.

In *Kleindienst,* the Court merely upheld the Attorney General's discretion to deny a waiver to allow an entry visa to a Marxist professor from Belgium who had violated the restrictions on his visa during an earlier visit. 408 U.S. at 756–60, 92 S.Ct. at 2578–80.

The *Kleindienst* analysis expressly rests upon the Attorney General's discretionary power to determine who may enter the country from abroad, a power exercised by the political branches as a derivative of the sovereign power to "defend[ ] the country against foreign encroachment and dangers." *Kleindienst,* 408 U.S. at 765, 92 S.Ct. at 2582–83; *see also Landon v. Plasencia,* 459 U.S. 21, 28, 103 S.Ct. 321, 326, 74 L.Ed.2d 21 (1982). The essential distinction between exclusion and deportation rests on this territorial concept of a diverse national community within which citizens and resident aliens interact. *See Kwong Hai Chew,* 344 U.S. at 597 n. 5, 73 S.Ct. at 477–78 n. 5 (noting that

constitutional protection of aliens stems from "the alien's presence within [the] territorial jurisdiction") (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950)). The Framers explicitly recognized that aliens within this country participate in a reciprocal relationship of societal obligations and correlative protection. "As [aliens] owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage." James Madison, *Report on the Virginia Resolutions, reprinted in* Jonathan Elliot, 4 *Debates on the Federal Constitution* 546, 556 (1907). The Supreme Court has also acknowledged a "longstanding distinction between exclusion proceedings, involving the determination of admissibility, and deportation proceedings" that corresponds to the basic difference between protected status within the national community and unprotected status at the threshold of admission. *Plyler v. Doe,* 457 U.S. 202, 212–13 n. 12, 102 S.Ct. 2382, 2392 n. 12, 72 L.Ed.2d 786 (1982). Accordingly, we decline to extend *Kleindienst* to apply to the deportation context.

*(b) Relevance of the Civil Nature of Deportation*

■ We also reject the Government's contention that First Amendment constitutional protections are unnecessary because deportation is not a criminal proceeding. It is true that some constitutional protections, available to citizens and aliens alike in the criminal setting, do not apply in civil proceedings and thus do not apply to the non-criminal deportation proceedings. *See, e.g., INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) (holding that the exclusionary rule is inapplicable to deportation); *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) (holding that the Ex Post Facto Clause is inapplicable to deportation). However, because the First Amendment's protections apply equally to non-criminal and criminal proceedings, *see, e.g., New York Times Co.,* 376 U.S. at 277, 84 S.Ct. at 724, constitutionally protected activities that the Government cannot punish by means of a criminal statute are likewise beyond its reach in a deportation proceeding.

*(c) Relevance of Congress' Plenary Power*

■ We find no merit in the Government's argument that the broad authority of the political branches over immigration matters justifies limited First Amendment protection for aliens at deportation. This is a variant of its jurisdictional argument that immigration issues that involve foreign policy concerns are non-justiciable political questions.

■ First, although Congress and the President may regulate aliens' admission and residence in the country, that regulation must be "consistent with the Constitution." *Fong Yue Ting v. United States,* 149 U.S. 698, 712, 13 S.Ct. 1016, 1021, 37 L.Ed. 905 (1893). "Since resident aliens have constitutional rights, it follows that Congress may not ignore them in the exercise of its 'plenary' power of deportation." *Bridges,* 326 U.S. at 161, 65 S.Ct. at 1455 (Murphy, J., concurring); *see also Chadha,* 462 U.S. at 940–41, 103 S.Ct. at 2778–79. Thus, Congress' less restrained power to decide which aliens to exclude from entry, using processes and procedures that would be constitutionally suspect for citizens, is not dispositive regarding the constitutional constraints that operate at deportation. *Cf. Haitian Centers Council, Inc.,* —— U.S. at ——-——, 113 S.Ct. at 2560–61 (acknowledging the "important distinction" between deportation and exclusion in upholding the President's power to establish foreign policy reasons for repatriation of undocumented aliens intercepted on the high seas); *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (upholding immigration preference categories for aliens at entry); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (upholding summary processes for exclusion of aliens at entry).

■ Second, our First Amendment jurisprudence rests on the fundamental principle that limitations on First Amendment rights are themselves damaging to the values underlying First Amendment protections. *See, e.g., Dombrowski,* 380 U.S. at 486–89, 85 S.Ct. at 1120–22. If aliens do not have First Amendment rights at deportation, then their

First Amendment rights in other contexts are a nullity, because the omnipresent threat of deportation would permanently chill their expressive and associational activities. *See* Part I.A.1.b.(3).

#### (d) *Inapplicability of Exceptions to First Amendment Protections*

 Nor are the contextual restrictions on speech that the Supreme Court has upheld in certain institutional settings with special needs analogous to the proposed restrictions on aliens subject to deportation. *See, e.g., Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 270–73, 108 S.Ct. 562, 569–71, 98 L.Ed.2d 592 (1988) (schools); *Turner v. Safley,* 482 U.S. 78, 89–93, 107 S.Ct. 2254, 2261–63, 96 L.Ed.2d 64 (1987) (prisons); *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (military); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (limitations on election campaign contributions); *Civil Serv. Comm. v. National Assoc. of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (restrictions on federal employee political activities). The speech in issue here is not confined to a particular setting.

#### (e) *Relevance of Other Distinctions Among Resident Aliens*

 We reject the government's contention that we apply gradations of First Amendment protection parallel to the rational distinctions that are permissible pursuant to the Equal Protection Clause in determining which citizens and aliens may receive particular government benefits. *See, e.g. Mathews v. Diaz,* 426 U.S. 67, 83–84, 96 S.Ct. 1883, 1893–94, 48 L.Ed.2d 478 (1976) (upholding a five-year residency requirement for medicare benefits for aliens); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 100–101, 96 S.Ct. 1895, 1903–04, 48 L.Ed.2d 495 (1976) (holding that an arbitrary regulation barring aliens from employment in the federal civil service violates due process, though suggesting that a classification based on a legitimate "overriding national interest" would not violate equal protection). Ordinary equal protection analysis requires only that the government bestow benefits in accord with classifications that rationally satisfy the stated government objective. *See, e.g., Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2291–93, 60 L.Ed.2d 870 (1979). In contrast, to deny citizens or aliens some measure of their admitted rights to First Amendment associational freedom would be to nullify the right in its entirety. The Government begs the question in asserting that differential treatment is merited because these six aliens with technical visa violations are at the bottom of the sliding scale of alien connections to this country; underlying this contention is the assumption that the Government can use the pretext of technical violations to expel aliens on the basis of their group affiliations. That is the heart of the selective enforcement claim under consideration.

 The aliens have provided evidence of disparate impact and of impermissibly motivated enforcement of the immigration laws. The aliens' First Amendment rights are subject to irreparable harm because of the prosecution, and they have a strong likelihood of success on their claim that the INS has selectively enforced the immigration laws in retaliation for their exercise of constitutionally protected rights. We conclude, therefore, that the district court did not abuse its discretion in granting a preliminary injunction against continued deportation proceedings for the Six.

### B. THE DUE PROCESS CHALLENGE TO THE USE OF CLASSIFIED INFORMATION

#### 1. *Standard of Review for a Permanent Injunction*

 The district court's grant of a permanent injunction is reviewed "for an abuse of discretion or application of erroneous legal principles." *United States v. Yacoubian,* 24 F.3d 1, 3 (9th Cir.1994) (quoting *Dexter v. Kirschner,* 984 F.2d 979, 982 (9th Cir.1992)). Questions of law or mixed questions of law and fact implicating constitutional rights are reviewed de novo. *LaDuke,* 762 F.2d at 1322. The requirements for the issuance of a permanent injunction are "the like-

lihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *Id.* at 1330 (citations omitted).

### 2. Appropriateness of the Permanent Injunction

#### a. Applicability of Due Process Protections to Aliens

 Aliens who reside in this country are entitled to full due process protections. *Diaz*, 426 U.S. at 77, 96 S.Ct. at 1890 (citations omitted); *see also Plasencia*, 459 U.S. at 32, 103 S.Ct. at 329 (finding that a returning longtime resident alien, unlike an alien seeking initial admission, has due process rights to an exclusion hearing); *Mezei*, 345 U.S. at 212, 73 S.Ct. at 629 (1953) (stating that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law").

The Government does not dispute that the Due Process Clause protects Barakat and Sharif, but it contends that reliance on undisclosed information to determine legalization satisfies the demands of due process.

#### b. Statutory and Regulatory Authority for Summary Process

Barakat and Sharif applied for legalization in 1987. Section 201(a)(1) of IRCA establishes a two-step process by which illegal aliens who satisfy the eligibility requirements receive temporary resident status and then, after an additional time in the country, permanent resident status. 8 U.S.C. § 1255a. Among other criteria, the alien must demonstrate admissibility as an immigrant. 8 U.S.C. § 1255a(a)(4). The Attorney General must grant temporary and permanent status if the applicants satisfy the statutory criteria. 8 U.S.C. §§ 1255a(a), (b).

At the time that Barakat and Sharif applied for legalization, the INS regulations required that all issues of statutory eligibility for immigration benefits, including legalization, be determined solely on the basis of information in the record disclosed to the applicant. 8 C.F.R. § 103.2(b)(3)(ii) (1990); *see also* 8 C.F.R. §§ 103.2(b)(3)(iii), (iv) (1990); 8 C.F.R. § 242.17 (1994) (allowing use of undisclosed, classified information only for discretionary decisions). However, after a three-year delay, the INS finally issued Notices of Intent to Deny to Barakat and Sharif in March 1991, pursuant to amended regulations, effective upon publication as interim rules in January 1991, that extended the confidential use of classified information to statutory entitlement determinations. 8 C.F.R. §§ 103.2(b)(3)(ii), (iv) (1994) (as amended). The INS claimed that the information's "protection from unauthorized disclosure is required in the interests of national security, as provided in 8 C.F.R. § 103.2(b)(3)(iv)."

 The Government cites section 235(c) of the Immigration and Nationality Act, 8 U.S.C. § 1225(c) (as amended), as authority for use of the undisclosed classified information in the legalization determination. That statute establishes the powers of INS officers to inspect aliens "seeking admission or readmission," 8 U.S.C. § 1225(a), to temporarily detain aliens who are not entitled to enter "at the port of arrival," 8 U.S.C. § 1225(b), and to exclude aliens on the particular finding by the Attorney General that confidential information supports that exclusion, 8 U.S.C. § 1225(c) (allowing summary process for exclusion). We do not, however, accept the proposition that denying a resident alien legalization is the same thing as "exclusion".

 Use of summary process in settings other than exclusion raises troubling due process concerns. *See, e.g., Kwong Hai Chew*, 344 U.S. 590, 73 S.Ct. 472 (barring the INS from using summary process to exclude a resident alien returning from abroad, because he was entitled to a hearing as of constitutional right). Thus, even reentering permanent resident aliens, who enjoy few rights because of the admitted power of Congress over entry into the country, are entitled to additional due process safeguards when subjected to the summary exclusion process. *Rafeedie*, 880 F.2d at 512, *on remand*, 795 F.Supp. 13, 20 (D.D.C.1992) (applying the *Mathews* balancing test to determine that subjecting a returning resident alien, who was accused of being a PFLP

officer, to summary exclusion proceedings utilizing secret information violated due process); *see also United States ex rel. Kasel de Pagliera v. Savoretti,* 139 F.Supp. 143 (S.D.Fla.1956) (holding summary exclusion of returning permanent resident aliens unconstitutional).

The Government's attempt to distinguish *Rafeedie* from the case at bar on the ground that legalization is a benefit is unpersuasive. Reentry is also a benefit—one for which aliens have no constitutional entitlement. *Plasencia,* 459 U.S. at 32, 103 S.Ct. at 329 ("an alien seeking initial admission to the United States requests a privilege").

■ This limitation of the classified information provision to the exclusion context comports with the requirement that administrative and judicial review of deportation orders be based on "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4); *see Whetstone v. INS,* 561 F.2d 1303, 1306 (9th Cir.1977) (finding that "[d]eportation on a charge not presented in the order to show cause, or at the hearing, would offend due process" because record evidence must establish the basis for deportation). Because legalization decisions are reviewable under the deportation review provisions, the statutory scheme does not support use of summary process which relies on secret information as an alternative to regular hearing requirements.

The Government asserts, however, that under case law allowing use of undisclosed information for determinations that are statutorily unreviewable because they are delegated to the Attorney General's sole discretion, it has full statutory authority to use secret information to decide a legalization application. *See Jay v. Boyd,* 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). Interpreting the statutory provision for suspension of deportation, 8 U.S.C. § 1254, the *Jay* Court upheld the use of undisclosed information to inform

the Attorney General's decision on the grounds that Congress explicitly delegated the decision to her "unfettered discretion" as "an act of grace." *Id.* at 354, 76 S.Ct. at 924–25. The statutory provision under consideration here, in contrast, requires that "the Attorney General shall adjust" the alien's status if the statutory eligibility requirements are satisfied. *See* 8 U.S.C. § 1255a(a). Thus, the extension of use of confidential information to mandatory statutory provisions such as the one at issue here is not warranted by the *Jay* rationale.[7]

■ The Government's reliance on *Campos v. INS,* 402 F.2d 758 (9th Cir.1968), is similarly misplaced. Dictum in that case suggests that an alien applying for legalization under the discretionary statute, 8 U.S.C. § 1255, is "assimilated" to the position of (treated as) an entering alien both in terms of eligibility criteria and in terms of procedural rights. *Id.* at 760. Our later cases, however, have interpreted this "assimilation" rule narrowly, holding that it "refers to the application of eligibility criteria for admission and to differences in burden of proof." *Firestone v. Howerton,* 671 F.2d 317, 320 & 320 n. 5 (9th Cir.1982). Moreover, further assimilation of applicants to the position of an alien at entry would virtually eliminate the primary distinction between aliens at entry and aliens residing within the country. Therefore, although applicants for legalization must satisfy the substantive admissibility requirements, their constitutional rights, including their right to procedural due process, are not correspondingly diminished. Thus, we find that there is no statutory or regulatory basis supporting the Government's interest in use of classified information in legalization decisions pursuant to § 1255a.

*c. The Mathews Balancing Test*

*(1) The Private Interest Affected*

■ Aliens who have resided for more than a decade in this country, even those

7. Our conclusion that the Government wrongly relied on § 1255a provides an additional basis for the district court's subject matter jurisdiction for this due process claim. Because exclusive review applies only to decisions on the record, agency resort to summary process necessarily requires judicial review in the district court pursuant to its general federal question and immigration law jurisdiction. *See Rafeedie,* 880 F.2d at 510–512, 512 (finding that "the generally applicable law of reviewability—that is to say, the [Administrative Procedure Act]—applies and provides for judicial review of such proceedings").

whose status is now unlawful because of technical visa violations, have a strong liberty interest in remaining in their homes. *See, e.g., Plasencia,* 459 U.S. at 34, 103 S.Ct. at 330; *Firestone,* 671 F.2d at 321 n. 10 (noting that the "equities" of long residence in the country are relevant to legalization). Similarly, the denial of legalization impacts the opportunity of an alien to work, which also raises constitutional concerns. *HRC,* 498 U.S. at 491, 111 S.Ct. at 895. The statute provides an entitlement not subject to denial according to the discretion of the Attorney General, as long as the eligibility requirements are satisfied. 8 U.S.C. § 1255a(a). Thus, the district court did not err in finding that the private interests affected are truly substantial.

### (2) The Risk of Erroneous Deprivation and Value of Safeguards

■ There is no direct evidence in the record to show what percentage of decisions utilizing undisclosed classified information result in error; yet, as the district court below stated, "One would be hard pressed to design a procedure more likely to result in erroneous deprivations." *See, e.g., Goss v. Lopez,* 419 U.S. 565, 580, 95 S.Ct. 729, 739, 42 L.Ed.2d 725 (1975) (finding that "the risk of error is not at all trivial" in summary discipline in school settings). Without any opportunity for confrontation, there is no adversarial check on the quality of the information on which the INS relies. *See Knauff,* 338 U.S. at 551, 70 S.Ct. at 316 (Jackson, J., dissenting) ("The plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected.") (citation omitted).

Although not all rights of criminal defendants are applicable to the civil context, the procedural due process notice and hearing requirements have "ancient roots" in the rights to confrontation and cross-examination. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

*Id.* As judges, we are necessarily wary of one-sided process: "democracy implies respect for the elementary rights of men … and must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Anti–Fascist Committee v. McGrath,* 341 U.S. 123, 170, 71 S.Ct. 624, 647–48, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). "It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions." *Abourezk,* 785 F.2d at 1061. Thus, the very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error. We conclude that the district court did not err in finding that there is an exceptionally high risk of erroneous deprivation when undisclosed information is used to determine the merits of the admissibility inquiry.

### (3) The Governmental Interest

■ The Government seeks to use undisclosed information to achieve its desired outcome of prohibiting these individuals whom it perceives to be threats to national security from remaining in the United States while protecting its confidential sources involved in the investigation of terrorist organizations. Yet the Government has offered no evidence to demonstrate that these particular aliens threaten the national security of this country. In fact, the Government claims that it need not. It relies on general pronouncements in two State Department publications about the PFLP's involvement in global terrorism and on the President's recent broad Executive Order prohibiting "any United States persons" from transacting business with the PFLP. *See* Exec.Order No. 12947 (January 23, 1995) (finding "that grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy

of the United States"). We take judicial notice of these government documents on appeal for the limited purpose of assessing the strength of the Government's interest, *see, e.g., Castillo–Villagra v. INS,* 972 F.2d 1017, 1030 (9th Cir.1992) (noticing a State Department report to assist in determining the plausibility of the petitioner's claim), yet we find these data insufficient to tip the *Mathews* scale towards the Government. These aliens have been free since the beginning of this litigation almost eight years ago, without criminal charges being brought against them for their activities. According to the district court, the government's *in camera* submission targets the PFLP: although it indicates that the PFLP advocates prohibited doctrines and that the aliens are members, it does not indicate that either alien has personally advocated those doctrines or has participated in terrorist activities.

If Barakat and Sharif engage in any deportable activities, the government is not precluded from contesting their legalization or from instituting deportation on the basis of non-secret information. If the Government chooses not to reveal its information in order to protect its sources, the only risk it faces is that attendant to tolerance of Barakat's and Sharif's presence so long as they do not engage in deportable activities. Thus, although the Government undoubtedly has a legitimate interest in protecting its confidential investigations, it has not demonstrated a strong interest in this case in accomplishing its goal of protecting its information while prohibiting these aliens' legalization.

The Government's attempt to bolster its interest by relying on permitted uses of undisclosed information is misguided. Although the courts have allowed the Government to keep certain information confidential, the exceptions to full disclosure are narrowly circumscribed. *Abourezk,* 785 F.2d at 1061. For example, a formal claim of a "state secrets privilege" may prevent discovery and shield the use of materials against the Government in tort litigation for damages. *Id.; see also United States v. Reynolds,* 345 U.S. 1, 6–7, 73 S.Ct. 528, 531–32, 97 L.Ed. 727 (1953) (in a tort suit against the Government, permitting nonproduction of an Air Force accident investigation report because of national security concerns); *Ellsberg v. Mitchell,* 709 F.2d 51 (D.C.Cir.1983) (in a constitutional tort suit for damages against officials, allowing the Government to withhold production of wiretap information), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984). However, the failure to disclose information prevents its use in the adversary proceeding: the effect of upholding the privilege is "that the evidence is unavailable, as though a witness had died." *Ellsberg,* 709 F.2d at 64. Even in those rare cases when the privilege operates as a complete shield to the government and results in the dismissal of a plaintiff's suit, the information is simply unavailable and may not be used by either side. *Id.; In re United States,* 872 F.2d 472 (D.C.Cir.), *cert. dismissed,* 493 U.S. 960, 110 S.Ct. 398, 107 L.Ed.2d 365 (1989); *Molerio v. F.B.I.,* 749 F.2d 815, 820–22 (D.C.Cir.1984) (dismissing a Title VII complaint). Here, the Government does not seek to shield state information from disclosure in the adjudication of a tort claim against it; instead, it seeks to use secret information as a sword against the aliens.

█ Because of the danger of injustice when decisions lack the procedural safeguards that form the core of constitutional due process, the *Mathews* balancing suggests that use of undisclosed information in adjudications should be presumptively unconstitutional. Only the most extraordinary circumstances could support one-sided process. We cannot in good conscience find that the President's broad generalization regarding a distant foreign policy concern and a related national security threat suffices to support a process that is inherently unfair because of the enormous risk of error and the substantial personal interests involved. "[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Chadha,* 462 U.S. at 944, 103 S.Ct. at 2780. Therefore, we find that the district court did not err in deciding that use of undisclosed classified information under these circumstances violates due process.

*3. Applicability of Permanent Injunction Standards*

Because there is no adequate remedy at law to compensate for denial of legalization based on a constitutional violation, and because the use of secret information about their affiliation with the PFLP irreparably injures Barakat and Sharif by depriving them of a strong liberty interest without due process and, indirectly, by chilling their First Amendment rights of expression and association, we affirm the district court's grant of a permanent injunction against use of undisclosed information to adjudicate Barakat's and Sharif's legalization applications.

## CONCLUSION

We find that the district court had subject matter jurisdiction, pursuant to its federal question and general immigration jurisdiction, over each of the claims presented here and that each claim is ripe for review. We affirm the district court's preliminary injunction against the selective enforcement of immigration laws against the Six; we reverse its determination that it lacks jurisdiction to review Hamide's and Shehadeh's selective enforcement claim, and we remand for that review; and we affirm the court's issuance of a permanent injunction against the use of undisclosed classified information in legalization proceedings pursuant to § 1255a.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

Plaintiffs in each case are entitled to their costs against the Government.